2002 SD 105

**TABLE STEAKS, Plaintiff and Appellee,**

v.

**FIRST PREMIER BANK, N.A. and Mastercard International, Defendant and Appellant.**

**No. 21878.**

Supreme Court of South Dakota.

Argued Jan. 9, 2002.

Decided Aug. 21, 2002.

Donald Srstka, Sioux Falls, for plaintiff and appellee.

James E. Moore and Jennifer L. Wollman of Woods, Fuller, Shultz & Smith, Sioux Falls, for defendants and appellants.

ANDERSON, LEE D., Circuit Judge.

[¶ 1.] Table Steaks, Inc., brought suit against First Premier Bank, NA (First Premier) and MasterCard International (MasterCard) after they terminated the credit card processing agreement and placed Table Steaks on the Combined Terminated Merchant File. A jury awarded Table Steaks a verdict of $259,000. We affirm.

### FACTS

[¶ 2.] Table Steaks is a restaurant and bar that also contains pool tables and video games. It is located in Edgewater, Colorado and owned by Table Steaks, Inc., a corporation whose stock is owned by Frank Burgess. Table Steaks has thirty-four employees and first opened for business on April 4, 1992.

[¶ 3.] Early in 1992, a representative of First Premier solicited Table Steaks to enter into a MasterCard/Visa credit card processing agreement for the restaurant. It told Table Steaks that it would enjoy higher gross receipts and less risk by accepting pre-approved credit card sales by the use of a credit card terminal. In addition, Table Steaks was assured that the electronic credit card terminal would not make mistakes.

[¶ 4.] On March 26, 1992, Table Steaks completed an application with First Premier to process MasterCard and Visa credit cards. First Premier and MasterCard accepted the application and within a month of its opening Table Steaks began taking MasterCard and Visa credit cards from its customers. However, no written acceptance of this application by First Premier was produced at trial.

[¶ 5.] Several months after opening the restaurant, Table Steaks also procured a Discover Card processing agreement with NaBANCO of Atlanta, Georgia. Table Steaks operated a growing business from the spring of 1992 through the spring of 1994. It did not experience any problems with either of its credit card processing agreements.

[¶ 6.] On Friday, June 3, 1994, during the start of a busy weekend for Table Steaks, the credit card system began refusing to approve the customers' credit cards. Table Steaks was hosting a regional pool tournament that weekend which a large number of people attended. Table Steaks assumed the system was malfunctioning and attempted to contact First Premier by phone. Despite numerous phone calls to First Premier over the weekend, Table Steaks did not receive any

explanation for the credit card refusal until Tuesday, June 7, 1994. On that date First Premier informed Table Steaks that the restaurant could no longer accept Master-Card/Visa credit cards and that Table Steaks had been placed on the Combined Terminated Merchant File.

[¶ 7.] Table Steaks then learned of discrepancies in the use of two credit cards at its business. During February and March of 1994, Table Steaks accepted charges on two credit cards issued to Robert Northcutt. One card was used at Table Steaks on six occasions in February 1994, and a second card was used at Table Steaks on six occasions in March 1994. First Premier and MasterCard claimed that the cards used were stolen and fraudulently presented. Northcutt signed an affidavit for the defendants claiming that his credit cards "may have been stolen." [1] Table Steaks never had any charge-backs and was not aware there were any problems with the Northcutt credit cards until after the termination of its credit card arrangement.

[¶ 8.] Although MasterCard had information of the claimed fraudulent use of the Northcutt credit cards, neither Master-Card nor First Premier informed Table Steaks of the problem. Instead, Master-Card sent a letter on May 17, 1994 to First Premier informing the bank that Table Steaks was a possible merchant violator. Specifically, the letter stated that Table Steaks had exceeded MasterCard's acceptable fraud percentage, which means over eight percent of Table Steaks' credit card sales were fraudulent during two consecutive months. The letter informed First Premier that because Table Steaks had exceeded the fraud threshold limit, it could either continue its relationship and agree to accept liability for all future fraudulent transactions at Table Steaks or terminate its relationship with Table Steaks. If First Premier chose to terminate the relationship, it was required to put Table Steaks on the Combined Terminated Merchant File, which listing would be shared with other credit card processing banks. Being placed in the Combined Terminated Merchant File would keep Table Steaks from obtaining a credit card processing agreement with other banks and would essentially block Table Steaks from accepting all credit cards from its customers.

[¶ 9.] Based on the information provided by MasterCard, First Premier terminated its Merchant Processing Agreement with Table Steaks on approximately June 3, 1994. The bank also placed Table Steaks on MasterCard's Terminated Merchant File. Although it was First Premier's customary policy to telephone its merchant customers about termination, it did not telephone Table Steaks to notify it of the termination.

[¶ 10.] Table Steaks' Discover Card processing agreement with NaBANCO was also terminated as a result of Table Steaks' placement on the Terminated Merchant File. Subsequently, Table Steaks made a number of unsuccessful attempts to procure other credit card processing agreements through other banks. Table Steaks eventually installed a cash machine/ATM machine to give its customers another payment option. It was not until November 1997 by the use of a joint guarantor, that Table Steaks finally located a bank that would resume processing credit card payments. Table Steaks' gross sales

---

**1.** With regard to the alleged fraudulent credit card transactions, it was intimated that a female roommate of Northcutt may have taken his credit cards and been involved in the alleged fraudulent use of the cards. However, in the testimony produced at trial it was never revealed who had actually used the cards at Table Steaks and other businesses. Apparently no attempt was made to engage the assistance of Table Steaks in investigating the claimed fraudulent credit card use.

immediately increased and within the next three years, the credit card sales rose to nine percent of the gross receipts.

[¶ 11.] In May 1997 Table Steaks filed this action alleging breach of contract against First Premier. It also alleged that First Premier and MasterCard tortiously interfered with Table Steaks' business relationships by wrongfully terminating the credit card service agreement. The jury found that First Premier committed a breach of contract and awarded damages in the amount of $9,000. The jury also found that both First Premier and Master-Card were liable for breach of interference with a valid business relationship or expectancy. The jury awarded Table Steaks additional damages of $150,000 against First Premier and $100,000 against MasterCard.

[¶ 12.] The issues are:

Was the evidence sufficient to support the jury's finding of breach of contract?

Was the evidence sufficient to support the jury's verdict that First Premier and MasterCard tortiously interfered with a valid business relationship or expectancy?

Did the trial court err in refusing to grant First Premier and MasterCard's motion for a new trial?

## STANDARD OF REVIEW

[¶ 13.] "Our review of the sufficiency of the evidence on appeal involves consideration of the evidence and inferences derived from the evidence in the light most favorable to upholding the verdict." *Builders Supply Co. Inc. v. Carr,* 276 N.W.2d 252, 257 (S.D.1979). We will consider First Premier and MasterCard's evidence only insofar as it tends to amplify, clarify, or explain evidence in support of the jury verdict. "If, when so viewed, there is competent and substantial evidence to support the verdict, then it must stand." *Id.*

Whether a new trial should be granted is left to the sound judicial discretion of the trial court, and this court will not disturb the trial court's decision absent a clear showing of abuse of discretion. If the trial court finds an injustice has been done by the jury's verdict, the remedy lies in granting a new trial. [W]e determine that an abuse of discretion occurred only if no 'judicial mind, in view of the law and the circumstances of the particular case, could reasonably have reached such a conclusion.'

*Junge v. Jerzak,* 519 N.W.2d 29, 31 (S.D. 1994) (citations omitted).

## ANALYSIS AND DECISION

### ISSUE ONE

[¶ 14.] **Was the evidence sufficient to support the jury's finding of breach of contract?**

[¶ 15.] There is no consensus between the parties as to whether the contract between them was written or oral. First Premier argues that in either scenario, it never breached its contract with Table Steaks. If the contract was written, First Premier argues that it contained a clause stating that termination could take place based on its sole determination. If the contract was oral, it argues that it was silent about the terms of termination, and is therefore terminable at will by either party. Table Steaks asserts that whether the contract was oral or written, it contained an implied covenant of good faith and fair dealing.

[¶ 16.] Regardless of the contract's form, an agreement did exist between the parties. The general rule is that every contract contains an implied covenant of good faith and fair dealing. *Garrett v. BankWest, Inc.,* 459 N.W.2d 833, 841 (S.D.1990). This implied obligation must arise from either the language

used in the contract (which is in dispute here) *or must be indispensable to effectuate the intention of the parties.* *Garrett,* 459 N.W.2d at 841. Table Steaks asserts that the intention of the parties in this case was to enhance its business by encouraging credit card purchases, and that the implied covenant of good faith and fair dealing is essential to such a contract.

■ [¶ 17.] Under the evidence presented, the jury reasonably concluded that First Premier did not act reasonably or in good faith when it abruptly terminated its credit card processing agreement with Table Steaks. In viewing the evidence in the light most favorable to Table Steaks, that evidence showed that Table Steaks was not contacted about the suspected fraudulent transactions and never given an opportunity to participate or assist in any investigation of those transactions. During the two year period prior to March 1994, First Premier never experienced any problems with Table Steaks' credit card processing. Having originally solicited Table Steaks' business and created the credit card processing relationship, First Premier's method of termination of the contract was unreasonable and a breach of the implied covenant of good faith and fair dealing. The jury's verdict of $9,000 against First Premier is not unreasonable or contrary to the evidence. "If this jury's verdict can be explained with reference to the evidence, rather than by juror passion, prejudice or mistake of law, then the verdict must be affirmed." *Bridge v. Karl's Inc.,* 538 N.W.2d 521, 525 (S.D.1995).

## ISSUE TWO

[¶ 18.] **Was the evidence sufficient to support the jury's verdict that First Premier and MasterCard tortiously interfered with a valid business relationship or expectancy?**

■ [¶ 19.] First Premier and MasterCard claim that no factual basis supports the jury verdict for tortious interference with a valid business relationship or expectancy. In order to succeed with a claim for tortious interference with a valid business relationship or expectancy, a plaintiff must prove the following essential elements:

1. the existence of a valid business relationship or expectancy;

2. knowledge by the interferer of the relationship or expectancy;

3. an intentional and unjustified act of interference on the part of the interferer;

4. proof that the interference caused the harm sustained; and,

5. damage to the party whose relationship or expectancy was disrupted.

*Landstrom v. Shaver,* 1997 SD 25, ¶ 73, 561 N.W.2d 1, 16.

[¶ 20.] First Premier and MasterCard claim that the evidence was insufficient to prove element 1, the existence of a valid business relationship or expectancy, and element 3, an intentional and unjustified act of interference on the part of the interferer.

■ [¶ 21.] In order for Table Steaks to prevail on the claim of tortious interference with a business expectancy, it must first be able to show that its relationship with an identifiable third party was affected by First Premier and MasterCard's actions. The public at large does not constitute an identifiable third person. *Sarkis v. Pafford Oil Co. Inc.,* 697 So.2d 524, 527 (Fla.App. 1 Dist.1997). Table Steaks produced evidence to show that it had a customer base that preferred to use credit cards for purchases. The customers amounted to approximately eight percent of Table Steaks' business. Prior to the

termination of the processing agreement Table Steaks was averaging 112 credit card transactions per month. In *Hayes v. Northern Hills General Hosp.*, 1999 SD 28, 590 N.W.2d 243, persons seeking medical care in a specific community were found to be an identifiable third party. Likewise, Table Steaks' customers that preferred to use credit cards for purchases constitute an identifiable third party.

[¶ 22.] Another identifiable third party are the banks that Table Steaks dealt with after it was placed on the Combined Terminated Merchant File. Table Steaks' evidence indicated that both NaBANCO and Discover quit doing business with Table Steaks because it was on the list. Table Steaks also introduced testimony that other banks refused to enter any credit card processing agreement with Table Steaks because it was on the list. There was sufficient evidence that Table Steaks' relationships with its credit card-paying customers and banks were noticeably affected by First Premier and MasterCard's actions.

[¶ 23.] The third element of tortious interference with a business relationship is "an intentional and unjustified act of interference on the part of the interferer." *Landstrom*, 1997 SD 25 at ¶ 73, 561 N.W.2d at 16. When First Premier became aware of the possible fraudulent transactions that had allegedly taken place at Table Steaks it did not notify Table Steaks or make any effort to substantiate the claims. Moreover, when given the choice to either assume liability for future fraudulent transactions at Table Steaks or to terminate Table Steaks' processing agreement, it unilaterally terminated the agreement without even a phone call to notify Table Steaks of the termination. First Premier did not attempt to discuss with Table Steaks an option to continue the credit card processing agreement with

Table Steaks incurring the responsibility for any future fraudulent transactions. The abrupt termination occurred more than two months after the date of the last alleged fraudulent transaction.

[¶ 24.] Table Steaks' evidence showed that First Premier and MasterCard were well aware that the elimination of credit card processing for Table Steaks would interfere with the continuing business relationship of Table Steaks and many of its customers. First Premier was also well aware of what would happen to Table Steaks if it chose to place Table Steaks on MasterCard's Combined Terminated Merchant File. The testimony indicated that it was common knowledge in the banking industry that businesses placed on that file would not even be considered for credit card processing agreements. The evidence supported the jury's finding that First Premier unreasonably interfered with Table Steaks' trade in the credit card industry when it placed Table Steaks on the Combined Terminated Merchant File.

[¶ 25.] The jury also heard evidence that MasterCard never made any effort to notify Table Steaks of the possible fraudulent transactions that took place over the span of two months. It never gave Table Steaks the opportunity to dispute any of the claims even though Table Steaks had never experienced any problems with its system in the past and had no reason to believe it had done anything wrong. MasterCard notified First Premier of the possible fraud and allowed it to choose Table Steaks' fate. MasterCard also reminded First Premier that MasterCard reserved the right to declare a merchant fraudulent under the exclusive MasterCard Merchant Fraud Rule.

[¶ 26.] After First Premier chose to place Table Steaks on MasterCard's Combined Terminated Merchant File in June 1994, Table Steaks remained on the list

until July 2000. Table Steaks' evidence indicated MasterCard refused to remove Table Steaks from the list even though a number of reasons supported the removal:

1. MasterCard received a letter from First Premier stating that Table Steaks believed that the alleged fraud incidents had no basis in fact.
2. All of the credit card sales were pre-approved by MasterCard's authorization center computer and Table Steaks did not know and could not have known that the sales were fraudulent.
3. First Premier formally asked MasterCard to remove Table Steaks from the Terminated Merchant File.
4. MasterCard knew or should have known that Table Steaks would be unable to obtain another processing agreement if it was placed in the file.

MasterCard did not notify Table Steaks that it had been taken off the list in July 2000. Table Steaks discovered this fact at trial when a representative of MasterCard testified. The evidence did not show that Table Steaks presented credit card records that it knew or should have known to be fraudulent.

[¶ 27.] The jury reasonably concluded that MasterCard exceeded its rightful authority and committed an intentional and unjustified act of interference when it forced the termination of Table Steaks' credit card processing agreement in the manner that occurred. Although Master-Card argues that it was protecting its own interests, "self interest is not a defense where a party's conduct is improper." 45 Am.Jur.2d, *Interference* § 28.

[¶ 28.] MasterCard labeled Table Steaks a fraudulent merchant, and through its Combined Terminated Merchant File spread this information throughout the bank credit card processing industry. MasterCard failed to remove Table Steaks from its list even after the removal was requested from the very bank that had placed it on the list. Sufficient evidence was introduced to support the jury's finding that an unjustified act of interference with Table Steaks' valid business relationships or expectancies occurred resulting in substantial damages.

ISSUE THREE

[¶ 29.] **Did the trial court err in refusing to grant First Premier and Master-Card's motion for a new trial?**

[¶ 30.] Following the entry of a judgment in favor of Table Steaks, First Premier and MasterCard moved for a new trial under SDCL 15-6-59. The trial court denied the motion.

[¶ 31.] First Premier and MasterCard contend that Table Steaks is judicially estopped from denying that a written contract existed. In bringing this issue of judicial estoppel before the trial court, they pointed out that a copy of a signed agreement between these parties had been attached to Table Steaks' pleadings in a related lawsuit filed in Colorado. However, Burgess of Table Steaks testified at trial that he was unaware of the existence of any such signed agreement.

[¶ 32.] First Premier and MasterCard were involved in the Colorado case and had ample opportunity to examine the pleadings from that case and address problems associated with them prior to or during trial. They did not do so. Under the doctrine of judicial estoppel the party is bound by his judicial declarations and may not contradict them in a subsequent proceeding involving the same issues and parties. Black's Law Dictionary 848 (6th ed. 1990).

[¶ 33.] In order for the doctrine of judicial estoppel to apply, the two positions must be absolutely irreconcilable. *Gesinger v. Gesinger*, 531 N.W.2d 17 (S.D. 1995). In the Colorado case, Burgess verified that the Colorado pleadings had both the application and merchant processing agreement attached to them. In this case, Burgess testified that he did not know if the merchant processing agreement was attached to the application he signed. These positions are not absolutely irreconcilable and therefore, judicial estoppel does not supply a basis requiring the granting of a new trial.

[¶ 34.] First Premier and MasterCard also claim that the trial court erred by allowing Table Steaks' witnesses to testify about damage calculations contained in exhibits 49 and 50. Table Steaks owner, Burgess, and Karen Loya, the office manager, testified concerning the lost income and profits of Table Steaks. During the cross-examination of Burgess, the defense questioned him on damages, which opened the door for further damage testimony. An owner of property is competent to testify about his damages. *Burke v. Thomas Chevrolet*, 88 S.D. 660, 227 N.W.2d 31 (1975).

[¶ 35.] On redirect examination, Burgess produced exhibits 49 and 50 that he, Loya and his attorney had prepared the night before. These exhibits provided a summary and calculation of Table Steaks' lost profits. The financial information used to support the calculations in the exhibits was based on Table Steaks' financial records, including records of credit-card sales. These had been given to the defense prior to trial. Over defense objections that the exhibits should have been produced during discovery, the testimony and exhibits were allowed into evidence.

[¶ 36.] Evidentiary rulings made by a trial court are presumed to be correct and are reversed only if there is an abuse of discretion. *In re Dokken*, 2000 SD 9, 604 N.W.2d 487. The admission of documentary exhibits does not warrant reversal absent a showing that substantial rights of the party were affected. *Sawyer v. Farm Bureau Mut. Ins. Co.*, 2000 SD 144, 619 N.W.2d 644. The trial court did not abuse its discretion in allowing these exhibits.

[¶ 37.] First Premier and MasterCard further allege that the trial court erred by allowing Table Steaks to present damage testimony of gross profits rather than net profits. In calculating Table Steaks' lost income and profits Table Steaks asserted that the fixed costs, including rent, taxes, utilities, telephone, repairs, depreciation and payroll existed whether Table Steaks had more credit card sales or not. For this reason, the only deductions shown by Table Steaks on Exhibits 49 and 50 were those additional costs that it would have incurred in earning the income it claimed to have lost, including the cost of goods and bank service charges.

[¶ 38.] In *Drier v. Perfection, Inc.*, 259 N.W.2d 496 (S.D.1977) this Court held that lost profits may be recovered under the reasonable certainty test, and admissibility of evidence rests largely in the discretion and practical judgment of the trial court. During the trial, defense counsel had adequate opportunity to cross examine Table Steaks' witnesses concerning both fixed and variable overhead expenses in order to present the jury with their version of Table Steaks' losses. Further, the trial court instructed the jury that it was to determine net profits in awarding any damages. The trial court did not abuse its discretion in allowing the damage testimony in this case.

[¶ 39.] First Premier and MasterCard also claim the trial court erred in submitting jury instruction No. 14. This instruction stated that if the jury believed the contract between the parties was written it could award incidental damages for breach of contract for thirty days and consequential damages beyond the thirty-day period. If the jury believed the contract was oral, it could not award incidental damages but could award consequential damages. Consequential damages were defined as "damages, loss, or injury as does not flow directly and immediately from the act of the parties, but only from some of the consequences or results of such act."

[¶ 40.] SDCL 21–2–1 provides that the measure of damages "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." The defense has not shown that this jury instruction was erroneous and that the error was prejudicial to the effect that the jury probably would have returned a different verdict. *City of Sioux Falls v. Hone Family Trust*, 1996 SD 126, 554 N.W.2d 825. The trial court did not abuse its discretion in giving jury instruction No. 14.

## CONCLUSION

[¶ 41.] The judgement is affirmed.

[¶ 42.] GILBERTSON, Chief Justice, and AMUNDSON, KONENKAMP, Justices, and GORS, Acting Justice concur.

[¶ 43.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

[¶ 44.] ANDERSON, LEE D., Circuit Judge, for SABERS, Justice, disqualified.