Brenda Ridlespurge sued her employer, Kmart Corporation, seeking workers' compensation benefits under the Workers' Compensation Act, Ala. Code 1975, § 25-5-1 et seq. ("the Act"), for injuries she alleges she sustained in the course of her employment. Ridlespurge, a manager of the electronics department at a Kmart store, was injured when a shelf holding a TV/VCR combination fell and struck her right shoulder. Seven months after the incident, Ridlespurge sought treatment for pain in her neck and right shoulder. Although doctors performed three surgeries on her right shoulder, the pain persisted. She was ultimately diagnosed as having fibromyalgia, an affliction in which inflammation of the muscles and the fibrous covering of the muscles causes chronic pain. Approximately one year and seven months after the incident at Kmart, Ridlespurge for the first time sought treatment for pain in her left shoulder and lower back, which she alleged was also caused by her work-related injury.
The trial court held that Ridlespurge's fibromyalgia and the injury to her left shoulder and back were not compensable, but that the injury to her right shoulder was, and it assigned a 40% loss of earning capacity to that injury. To support its judgment, the trial court made the following factual findings: (1) that Ridlespurge's fibromyalgia did not result wholly or partially from her work-related injury, but, rather, was attributable to the emotional stress of the filing of a criminal indictment against Ridlespurge and her husband[1]; *Page 1207 
(2) that Ridlespurge had sustained a 40% loss of earning capacity as a result of the injury to her right shoulder; and (3) that the pain in Ridlespurge's left shoulder and lower back was not attributable to her on-the-job injury.
The Court of Civil Appeals affirmed the trial court's judgment insofar as the trial court held that the injury to Ridlespurge's back and left shoulder was not compensable and that the injury to her right shoulder was compensable; it reversed the trial court's judgment insofar as it held that her fibromyalgia was not a compensable injury and insofar as it determined she had suffered a 40% loss of earning capacity from the injury to her right shoulder. Ridlespurge v. Kmart Corp.,812 So.2d 1197 (Ala.Civ.App. 2000). Kmart petitioned this Court for certiorari review of the Court of Civil Appeals' judgment insofar as it held that the fibromyalgia was compensable and that Ridlespurge was totally and personally disabled. We granted the petition. We reverse and remand.
This appeal presents the following issues: (1) Did the Court of Civil Appeals, in determining that Ridlespurge's fibromyalgia was a compensable injury, improperly substitute its judgment for that of the trial court? and (2) Did the Court of Civil Appeals improperly substitute its judgment for that of the trial court in determining that Ridlespurge was permanently and totally disabled?
 Standard of Review
Section 25-5-81(e)(2), Ala. Code 1975, a part of the Act, states that if an appellate court is reviewing "pure findings of fact" in a workers' compensation case, "the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. FoundersLife Assur. Co. of Florida, 547 So.2d 870, 871 (Ala. 1989), quoted in Exparte Northam, 689 So.2d 854, 856 (Ala. 1996); see Ala. Code 1975, §12-21-12(d). As this Court explained in Ex parte Golden Poultry Co.,Inc, 772 So.2d 1175 (Ala. 2000), the Court of Civil Appeals in a workers' compensation case "is authorized to determine whether the trial court's decision is supported by sufficient evidence [i.e., substantial evidence], but it is not authorized to independently weigh the evidence." 772 So.2d at 1177 (citing Ex parte Alabama Ins. Guar. Ass'n, 667 So.2d 97,99 (Ala. 1995)) (emphasis and bracketed language added).
 Compensability of Fibromyalgia Condition
Kmart argues that the Court of Civil Appeals' reversal of that portion of the trial court's judgment holding that Ridlespurge's fibromyalgia was not a compensable condition under the Act was improper. Kmart argues that in reversing the trial court's decision the Court of Civil Appeals ignored the evidence in the record that supported that decision. In its order, the trial court wrote:
 "[T]here is insufficient evidence to conclude that the fibromyalgia condition, if it exists at all, was either caused or contributed to . . . by [Ridlespurge's] on-the-job injury. In fact, the substantial evidence leads this Court to conclude that the fibromyalgia condition developed as a result of the stress associated with the criminal charges filed against [Ridlespurge] and her husband. Accordingly, the Court concludes that the fibromyalgia condition is not a compensable *Page 1208 
condition under the Workers' Compensation Act and the Defendant is not responsible for providing workers' compensation benefits, including medical benefits to the Plaintiff for the treatment of said condition."
The Court of Civil Appeals stated that "the record does not contain substantial evidence to support the trial court's determination that Ridlespurge's fibromyalgia is not compensable under the Act."Ridlespurge, 812 So.2d at 1201. We disagree.
Section 25-5-51, Ala. Code 1975, a part of the Act, provides that a compensable injury is one "caused by an accident arising out of and in the course of [the employee's] employment." That language requires a causal connection between the injury and the employment. Ex parte TrinityIndus., Inc., 680 So.2d 262, 267-68 (Ala. 1996). The phrase "in the course of" refers to the time, place, and circumstances under which the accident occurred. Id. In cases involving a sudden and traumatic event, such as the one here, an employee must produce substantial evidence tending to show that the accident occurred and also that the accident caused or was a contributing cause of the injury for which benefits are being sought. Id. at 266 n. 3.
The record contains substantial evidence to support the trial court's finding that Ridlespurge's fibromyalgia is not a compensable injury under the Act. Dr. Douglas Bell, the doctor who diagnosed Ridlespurge's fibromyalgia, stated in his deposition that the impact of the TV/VCR combination that fell on Ridlespurge's right shoulder was causally related to her fibromyalgia.[2] Dr. Bell, however, also testified that emotional stressors can be a contributing cause of fibromyalgia[3] and that a criminal indictment could be an emotional stressor that would trigger the condition.[4] Dr. Bell admitted in his deposition, however, that when he was treating Ridlespurge he was unaware of Ridlespurge's criminal indictment and that the *Page 1209 
existence of the indictment was not a factor in his diagnosis.[5]
Dr. Ronald Rivard, who performed an independent medical examination of Ridlespurge, testified by deposition that fibromyalgia is a painful condition and that its symptoms are "vague." (R. 181.) He stated that the condition is "recognized by some [medical professionals], not recognized by others." (R. 182.) Finally, Claude Franklin Peacock, Ridlespurge's vocational expert, agreed at trial that fibromyalgia is a condition the existence of which is disputed and that stressful events can be a contributing cause of the condition.[6]
Clearly, the record contains substantial evidence to support the trial court's finding that Ridlespurge's fibromyalgia is not compensable under the Act. The Court of Civil Appeals' reversal of that portion of the trial court's judgment to the compensability of Ridlespurge's fibromyalgia was improper. Thus, we reverse the judgment of the Court of Civil Appeals as to this issue.
 Loss in Earning Capacity
Kmart contends that the Court of Civil Appeals' reversal of that portion of the trial court's judgment holding that Ridlespurge had suffered a 40% loss in earning capacity was improper. The Court of Civil Appeals wrote: "[T]he record does not contain substantial evidence to support the trial court's finding that Ridlespurge was not permanently and totally disabled." Ridlespurge, 812 So.2d at 1203.
In its order, the trial court stated:
 "While the Court questions the degree and source of the Plaintiff's pain and discomfort[,] the Court finds that the Plaintiff has sustained a loss of earning capacity as a result of the reported injury and subsequent surgical procedures to the Plaintiff's right shoulder. The Court has considered the testimony of both the Plaintiff's and [the] Defendant's vocational experts. The Court finds that the Plaintiff's expert's opinion is too high and the Defendant's is too low. Instead, the Court finds that the Plaintiff has sustained a loss of earning capacity of 40 percent, for which the Plaintiff is entitled to permanent partial benefits."
(Emphasis added.)
The evidence regarding Ridlespurge's loss of earning capacity indicates as follows: Dr. Rivard testified in his deposition that Ridlespurge had suffered a 10% *Page 1210 
impairment "of the whole person."[7] Dr. James Flanagan, a surgeon who performed two surgeries on Ridlespurge's right shoulder, testified in his deposition that although he had not assigned an impairment rating to Ridlespurge, he agreed with Rivard's conclusions about her loss of earning capacity.[8] Ridlespurge's vocational expert Claude Peacock testified at trial that when he first examined Ridlespurge, he thought she was "totally vocationally disabled."[9]
However, Mr. Peacock later testified that he assigned Ridlespurge a 35% loss of earning capacity when he evaluated her ability to work.[10]
Finally, Ridlespurge testified as to her condition and her ability to work. (R. 20-24.)
The trial court's findings, if supported by the evidence, are conclusive. Ex parte Golden Poultry Co., 772 So.2d 1175, 1176 (Ala. 2000). It is well established that in workers' compensation cases a trial court has considerable discretion in determining an employee's loss of earning capacity. Ex parte Alabama Ins. Guaranty Ass'n, 667 So.2d 97, 100
(Ala. 1995). Further, a trial court is not bound by the opinions of expert witnesses, even if the testimony of those witnesses is uncontroverted. Ex parte Beaver Valley Corp., 477 So.2d 408, 411 (Ala. 1985).
Our review of the record indicates that the testimony and the evidence presented at trial support the trial court's finding that Ridlespurge suffered a 40% loss in earning capacity as a result of the injury to her right shoulder. It is apparent from the order that the trial court focused on the opinions of the expert witnesses in ascertaining Ridlespurge's earning-capacity loss. The trial court's statement in its order that "[Mr. Peacock]'s opinion is too high" demonstrates that the trial court mistakenly relied on Mr. Peacock's *Page 1211 
initial assessment that Ridlespurge was totally vocationally disabled. However, as explained above, Mr. Peacock's opinion at trial was that Ridlespurge had suffered a loss of earning capacity in the range of 35%. Certainly, the trial court's finding of a 40% loss of earning capacity is within the "range of 35%." Furthermore, the trial court had the benefit of observing Ridlespurge as she testified regarding her ability to perform certain work-related tasks. Thus, we conclude that the trial court's finding that Ridlespurge suffered a 40% earning loss was supported by substantial evidence. We hold that the Court of Civil Appeals improperly substituted its judgment for the trial court's judgment in this respect, and we reverse that portion of its judgment.
 Conclusion
For the above reasons, we reverse the judgment of the Court of Civil Appeals insofar as it relates to the compensability of Ridlespurge's fibromyalgia and insofar as it determined that Ridlespurge was "permanently and totally disabled" because of her right-shoulder injury. We remand this case to the Court of Civil Appeals for that court to enter an order consistent with this opinion.
REVERSED AND REMANDED.
See, Lyons, Brown, Johnstone, Harwood, Woodall, and Stuart, JJ., concur.
Moore, C.J., recuses himself.*
* Chief Justice Moore was the trial judge in this case.
[1] On December 15, 1997, a grand jury in Etowah County indicted Ridlespurge and her husband for "trafficking in methamphetamine and unlawful possession of controlled substances." (R. at 379-80.) Ridlespurge did not inform her doctors of the indictment during her treatment.
[2] In his deposition, Dr. Bell testified:
 "Q: [Ridlespurge's counsel] If I said, `Can you state that to a reasonable medical certainty' would be the key words —
". . . .
 "A: [Dr. Bell] That the whole sequence of events is reasonable, you know, it's the injury that caused the fibromyalgia. Is that what you're asking?
"Q: Yes.
 "A: Again, you know, based on the information that I have available, I think that it's a reasonable conclusion to draw that her fibromyalgia is related to the injury."
(R. 337-38.)
[3] In his deposition, Dr. Bell testified:
"Q:[Ridlespurge's counsel] Tell me what fibromyalgia is.
 "A: [Dr. Bell] Fibromyalgia is a syndrome where there is a lot of complaints, but typically people complain of defuse [sic] pain, complain of flu-like symptoms. They typically have a sleep disorder, lack of sleep. They have tender spots that when pushed on they will be more sensitive than other places, and they have exercise intolerance, typically. And a lot of times there can be a stressor of some kind, too. . . .
"Q: What do you mean by stressor of some kind?
 "A: You know, emotional or physical stress can make it worse."
(R. 317-18.)
[4] In his deposition, Dr. Bell testified:
 "Q: Is [a criminal indictment] a type of event that could be a stressor to a patient that could trigger this problem?
"A: Without knowing the specifics, I would say yes.
 "Q: The more severe the charge the likelier the increased stress?
 "A: Again, you know, I would say, you know — you know — some sort of criminal charge or difficulty would certainly be a stress and I think it certainly would qualify."
(R. 342.)
[5] In his deposition, Dr. Bell testified:
 "Q: [Ridlespurge's counsel] Now, during your course of treatment of Mrs. —
"A: [Dr. Bell] No, sir, I did not.
 "Q: Were you aware of any pending criminal charges that have been filed —
"A: No, sir.
"Q: — against Mrs. Ridlespurge or her husband?
"A: None was mentioned. None was asked about."
(R. 341-42.)
[6] Mr. Peacock's testimony at trial reads:
 "Q: [Ridlespurge's counsel] Now, as far as the fibromyalgia diagnosis, is it your understanding that these pain complaints are coming from that fibromyalgia condition?
"A: [Mr. Peacock] Right.
". . . .
 "Q: Are you aware that Dr. Rivard testified that that condition — that some doctors recognize it and some don't?
"A: That's true.
"Q: It's very questionable, very controversial rather?
"A: Depending on the doctors, that's true.
 "Q: Were you aware that fibromyalgia can be caused by stressful events?
 "A: It's exacerbated, I think, more than caused, based on my information.
"Q: Can bring it — can cause it to come on?
"A: True, and be much worse for the individual."
(R. 85-86.) (Emphasis added.)
[7] Plaintiff's Exhibit 1 to Dr. Rivard's deposition includes a September 24, 1998, letter to Dr. Flanagan from Dr. Rivard, in which he writes: "my estimation is that she has an impairment of 16% of the right upper extremity [right shoulder], which, in turn, corresponds to animpairment of 10% of the whole person." (Emphasis added.)
[8] Dr. Flanagan's testimony, in his first deposition, reads:
 "Q: [Ridlespurge's counsel] And have you had an occasion to place a limitation or an impairment rating — medical impairment rating on her right shoulder?
 "A: [Dr. Flanagan] To the best of my recollection, I have not assigned any impairment rating."
(R. 252.)
In his second deposition, Dr. Flanagan testified as follows:
 "Q: [Ridlespurge's counsel] As I understand your testimony, you agreed with the findings of Dr. Rivard with regard to his functional capacity evaluation; is that correct?
"A: [Dr. Flanagan] Yes sir."
(R. 300-01.)
[9] Mr. Peacock's testimony at trial reads:
 "Q: [Ridlespurge's counsel] Okay. Now, based on your testing, your review of the medical evidence, your experience and training and your review and discussions and interview with Mrs. Ridlespurge, did you form an opinion as to her vocational disability?
"A: [Mr. Peacock] I did.
"Q: All right. And what is that opinion, please, Sir?
 "A: Based on the information provided me in the interview I feel that she was totally, or a hundred percent vocationally disabled at the time that I saw her [on January 27, 1999]."
(R. 65.) (Emphasis added.)
[10] Mr. Peacock's testimony at trial reads:
 "Q: [Ridlespurge's counsel] [D]o you have an opinion as to what [Ridlespurge's] vocational loss would be?
". . . .
 "A: [Mr. Peacock] . . . [T]he capacity to function in an open market so you're still going to be looking, probably in the 35% range just as a range of measurement."
(R. 85.) (Emphasis added.)