2002 SD 130

**Ann M. RAWLS, Claimant and Appellant,**

v.

**COLEMAN–FRIZZELL, INC. and North River Insurance Co., Employer–Insurer and Appellees.**

No. 22282.

Supreme Court of South Dakota.

Considered on Briefs Aug. 26, 2002.

Decided Oct. 23, 2002.

Dennis W. Finch of Finch, Bettmann, Maks & Hogue, Rapid City, South Dakota, Attorneys for claimant and appellant.

Benjamin J. Eicher of Wallahan & Eicher, Rapid City, South Dakota, Attorneys for employer-insurer and appellees.

KONENKAMP, Justice.

[¶ 1.] In this workers' compensation case, the claimant argues (1) that several ailments, including fibromyalgia and chronic myofascial pain, arose out of injuries she suffered several years before when she fell through a trap door while working for her employer, and (2) that she should be awarded temporary total and partial disability benefits. The Department of Labor ruled that the claimant failed to show causation and denied both

claims. The circuit court affirmed, and we also affirm.

### Background

[¶ 2.] On December 12, 1990, Ann Rawls, while at work at her job with Coleman–Frizzell, Inc. (C–F), a manufacturer of jewelry in Rapid City, South Dakota, fell part way through a hallway trap door that had been left open for maintenance purposes.[1] Rawls was injured and taken to the emergency room in Rapid City Regional Hospital, where she was examined and then treated for a dislocated finger. Four months later, the examining physician modified his report, at Rawls's request, to include a statement that she had also complained of back and shoulder pain when she was admitted.[2] On January 9, 1991, an orthopedist examined Rawls's shoulder, cervical spine, and lumbar spine. He diagnosed a "mild contusion with some pulling of muscles and ligaments" and gave a prognosis of slow improvement over time.

[¶ 3.] After the accident at C–F, Rawls did not work a full forty-hour week there, but altogether she missed fewer than seven days. She returned to work on a part-time basis three or four days after the accident, taking pain pills for a few weeks until she was no longer able to secure further refills. Still complaining of pain, she was advised to undertake warm-water therapy. On April 8, 1991, her regular physician (Dr. Stephen Goff, a physiatrist) concluded that Rawls did not require further physical therapy, but, in view of her continued complaints of pain, recommended "work-hardening," i.e., that her work hours per week be reduced to a comfortable level and that one hour be added each week until she was again working a full eight-hour day. Under the work-hardening program, Rawls was initially set to work four to five hours per day, but her physician later reduced her regimen to two hours per day.

[¶ 4.] C–F agreed to the work hardening program, provided her with work within her medical restrictions, and hired an attendant (Jeff Bailie) to assist Rawls in her return-to-work efforts. In the midst of this program, Rawls took a two-week vacation that had been approved by C–F before she had begun the program and resulted, to her supervisor's displeasure, in her having to begin the program back at the two-hours-per-day level. Upon her return, she and the supervisor exchanged angry words over the effect of her vacation on her program; Rawls then told a co-worker that all she needed now was "to get fired."[3]

[¶ 5.] Occurring in parallel with Rawls's medical problems was her continuing difficulty in getting along with her supervisors at C–F. Testimony indicated that Rawls was initially hired because she and one of C–F's owners attended the same church. In the three years she worked at C–F, she had a variety of jobs, beginning in the main office, then moving, at her request, to the factory where she could be more creative, then working in the retail store, and finally moving to the design department, where she worked as a "floater," i.e., one with no specific task. Her relationship with the owner made it difficult for her various supervisors to hold

---

1. Others at C–F testified that they had received notice that the trap door was to be open for a period that day. Rawls claims not to have been so notified.

2. Rawls also testified that she suffered extensive bruising on her right knee and thigh, down her calf on the inside of her right leg, and all over her left arm, elbow, and hand.

3. Rawls later testified that she made this comment out of frustration and that she did not mean it.

Rawls to normal work rules. At this last post, her supervisor was instructed just to give her something to do. Finally, on July 15, 1991, she was fired for poor performance and insubordination.

[¶ 6.] After Rawls's severance from C–F, the company's insurer continued to provide her with the assistance of Bailie, but the prospect of her returning to work was dimmed by the continuance of the work hardening program ordered by Goff. At some point during 1991, Bailie was replaced by Shari McDonald. Thereafter, Rawls requested that she be sent to a university to earn a master's degree so that she could be a teacher. The insurer denied that request on the ground that other possible positions would require less expensive retraining. Finally, McDonald "closed the file" on Rawls because Rawls would not cooperate in the return-to-work effort.

[¶ 7.] In November 1991, Goff released Rawls to work an eight-hour day with the restrictions that she should alternate sitting, standing, and walking. Goff reported that Rawls was "capable of performing several repetitions per hour of bend/stoop, squat and reach above shoulder level." He assigned Rawls an eight-percent impairment rating of her whole body.

[¶ 8.] Rawls worked sporadically as a substitute teacher and as a teacher's aide in the Rapid City School District from September 1991 through May 1995. Throughout that period and beyond, she suffered from persistent, debilitating headaches. In April of 1992, Rawls began two seasons of employment at Mount Rushmore as a park ranger and interpretive guide. In her application for work there, she affirmed that she had *no* difficulty "in using arms, hands, or fingers for reaching

in any direction, grasping, handling or fingering" and *no* "disease or disability which would make [her] employment in light-duty work a hazard to [herself] or others." She also affirmed that she would be able to perform *all* the duties that the job required of her. Her position at Mount Rushmore required her to work forty hours per week, walking as well as sitting and standing for long periods. During her time at Mount Rushmore, she hiked, without incident, to the top of the mountain and back down, negotiating steep stairs and rough terrain.

[¶ 9.] In July 1992, an MRI of Rawls's left shoulder showed a "tear of rotator cuff tendon on the left with an element of impingement at the shoulder outlet." Surgery was prescribed, but postponed until January 4, 1993, so that she could complete the season's work at Mount Rushmore. On June 7, 1993, her surgeon found the shoulder to be at maximum medical improvement (with a five-percent impairment to the left upper extremity). He declared Rawls capable of returning to her regular and customary work.[4] She then completed the season's work at Mount Rushmore. She did not, however, apply to work there for the 1994 season: she reported to a coworker that she would not be able to get along with the supervisor to whom she had reported during the previous two seasons.

[¶ 10.] In the fall of 1993, Rawls worked for two weeks at Mostly Chocolates; her tasks included rolling and dipping truffles. During that brief period, she reported pain in her right wrist. Three physicians examined her and agreed that she suffered from "mild right carpal tunnel syndrome." By April 1994, howev-

---

**4.** As Rawls's rotator cuff injury presumably occurred in the trap-door incident, C–F's insurer paid Rawls temporary total disability for her period of recuperation from her shoulder surgery.

er, another physician, a neurologist, found that the problem was "much improved to resolved." (Rawls is not making a claim for this ailment.)

[¶ 11.] In early 1994, Dr. Goff diagnosed Rawls as having "chronic myofascial pain," and Dr. Steven K. Hata diagnosed her as having "a chronic-cervical-strain syndrome with myofascial neck and shoulder pain and chronic-low-back-strain syndrome with myofascial pain." Hata also found "degenerative arthritis and disc disease involving [Rawls's] lumbar and cervical spine, with multi-level bulging discs."

[¶ 12.] During the spring of 1994, Rawls also developed difficulty in keeping her balance when her eyes were closed. One examining physician, Dr. Hata, found, in September 1994, "no objective evidence of specific neurologic impairment causing this off balance; ... hence, patient is told that this condition is not ratable." She was given, among other things, an MRI of her head to determine whether the problem lay there, but the results were normal.[5] In the spring of 1995, Rawls was examined to determine her impairment rating. At that time, she was diagnosed with degenerative disc disease of her cervical and lumbar spine, with associated mechanical dysfunction and a chronic shoulder strain. The examining physician, Dr. Koehn, opined that Rawls should be able to function within her restrictions (with occasional need for conservation care for exacerbations) and, using the AMA Guidelines for the Evaluation of Permanent Impairment, calculated a twenty-percent impairment rating. In January 1996, an occupational therapist, Jeff Sjosten, performed a Functional Capacity Assessment (FCA) on Rawls. The results of the FCA showed that Rawls "may be able to work at a light level of employment ... that is self-paced and allows for frequent changes of position" but that her balance problems would prevent her from taking employment that required continual standing. According to the FCA report, her

[p]rimary limiting factor for continuing most tests was not due to back, neck, or shoulder pain, as her past medical history would predict, but was due to reoccurring loss of balance and complaints of wrist and hand pain. [Rawls] described her wrist and hand pain as a carpal tunnel type, but did not complain of these symptoms during tests that should exacerbate these symptoms. She complained of these symptoms during tests that would not normally have an effect on carpal tunnel syndrome.

[¶ 13.] In February 1996, a Rapid City dentist examined Rawls to determine whether there was a connection between her persistent headaches and dental problems. He found "no concrete evidence of temporomandibular joint problems as the cause of her headaches." Later that year, at the insistence of C–F's insurer, Rawls was given a personality test, the results of which were in the normal range, thus indicating no need for ongoing mental health therapy. Rawls took a ten-day vacation in Scotland (U.K., not S.D.) during 1996, and at some point during that year began caring for a two-week-old child Rawls and her husband adopted nine months later.

[¶ 14.] In April 1996, Dr. Cynthia Weaver, a rheumatologist, diagnosed Rawls as having "fibromyalgia." Weaver specifically excluded "myofascial-pain syndrome because [Rawls's] complaints of pain were diffuse, not localized in one discrete area as with myofascial pain." Importantly for this case, Dr. Weaver "could

---

**5.** Other MRI studies did, however, reveal that Rawls has a bulging disc in her neck and another in her lower back. Neither disc has been found to be impinging on any nerves or causing symptoms. No causation for these bulging discs has been established.

not opine to a reasonable degree of medical probability or certainty that [Rawls's] December 12, 1990, injury caused or contributed to her development of fibromyalgia."

[¶ 15.] Beginning in March 1998, Rawls had a series of thirteen sessions with Dr. Donald Burnap, a Rapid City psychiatrist. He diagnosed Rawls as having a "chronic pain disorder and dysthmic disorder."[6] He also opined that Rawls's trap-door injury was "the primary causative factor" of her then-current symptoms:

> In reviewing all of the medical records, she got hurt, and she continues to have a specific pattern of pain and dysfunction that matches the kind of injury she experienced, in that fall, to certain parts of her body; injured in certain ways, and she still exhibits the same picture.[7]

Some two months later, Dr. Hata found that Rawls "has a sleep disturbance. The fact that she does have fibromyalgia syndrome complicates matters as she could very well also have sleep apnea causing disturbed sleep[; in] particular[,] leg-jerking complaints[,] which bother her a lot[,] might relate to such."

[¶ 16.] Her prospects for employment are mixed. One vocational rehabilitation specialist, hired by Rawls, testified that with her current restrictions, Rawls is unemployable, has no transferable skills, and "is not a candidate for retraining or rehabilitation programs." Another rehabilitation specialist, hired by C–F's insurer, testified that Rawls "is employable, given her current restrictions, but that such employment would not provide her with a substantial wage"; he also opined that Rawls "is fully employable, given her restrictions

on the 1996 FCA." As to her current situation, Rawls remains "totally unemployed," as she has been since 1995, but she can walk four to five miles per day and maintains, at the Rapid City YMCA, an exercise program that includes weight lifting and aerobic conditioning classes.

[¶ 17.] In a memorandum decision, the Department's ALJ found that Rawls could not establish that her various injuries and complaints were caused by her accident at C–F and that, therefore, Rawls's current condition is not compensable. The ALJ did find, however, that Rawls's request for temporary total and partial disability benefits due for lost time before June 7, 1993, was to be granted. Upon C–F's filing a motion for reconsideration on the second issue, the ALJ reversed her decision. Rawls appeals on the following issues: (1) Did her condition arise out of and in the course of her employment with C–F? (2) Is Rawls entitled to additional disability benefits?

### Standard of Review

[¶ 18.] Our standard of review, delineated in SDCL 1–26–36, requires us to give great weight to the findings and inferences made by the Department on factual questions. *Sopko v. C & R Transfer Co., Inc.*, 1998 SD 8, ¶ 6, 575 N.W.2d 225, 228. We examine agency findings in the same manner as the circuit court to decide whether they were clearly erroneous in light of all the evidence. *Id.* Only if, after careful review of the entire record, we are definitely and firmly convinced that a mistake has been made, will we reverse. *Id.* Questions of law, of course, are fully reviewable. *Id.*

---

6. Dysthymic disorder is defined as: "depressed mood for most of the day, for more days than not, as indicated either by subjective account or observation of others, for at least 2 years." Dysthymic Disorder, 300.4, DSM–IV.

7. The ALJ rejected Dr. Burnap's opinion.

## Analysis and Decision

[¶ 19.] We begin with our accustomed understanding that workers' compensation statutes should be construed liberally in favor of injured employees. *Id.* at ¶ 8, 575 N.W.2d at 229. The overall purpose of workers' compensation is to provide for employees who have lost their ability to earn because of an employment-related accident, casualty, or disease. *Id.*

[¶ 20.] As the extensive factual background shows, Rawls has had a number of serious medical problems: dysthymic disorder, either fibromyalgia *or* myofascial-pain syndrome, severe headaches, sleep apnea, difficulty in maintaining balance, and damaged spinal discs. To prevail on a claim for workers' compensation, however, Rawls must do more than prove that an injury sustained at her workplace preceded her medical problems. The axiom *"post hoc, ergo propter hoc,"* refers to "the fallacy of . . . confusing sequence with consequence," and presupposes a false connection between causation and temporal sequence. Black's Law Dictionary 1186 (7th ed 1999). This maxim has little value in the science of fixing medical causation. *See, e.g. Young v. Hickory Business Furniture*, 353 N.C. 227, 538 S.E.2d 912, 916 (2000). Indeed, Rawls has the burden of proving all facts essential to sustain an award of compensation. *King v. Johnson Bros. Constr. Co.*, 83 S.D. 69, 155 N.W.2d 183, 185 (1967). In *Caldwell v. John Morrell & Co.*, we explained what is required of claimants in South Dakota if they are to prevail on a claim for workers' compensation:

> Before an employee can collect benefits under our [workers'] compensation statutes, [she] must establish, among other things, that there is a causal connection between [her] injury and [her] employment. That is, the injury must have its origin in the hazard to which the employment exposed the employee while doing [her] work. This causation requirement does not mean that the employee must prove that [her] employment was the proximate, direct, or sole cause of [her] injury; rather, the employee must show that [her] employment was *"a contributing factor"* to [her] injury.

489 N.W.2d 353, 358 (S.D.1992) (emphasis in original) (internal citations and quotations omitted). "The employee's burden of persuasion is by a preponderance of the evidence." *Id.* The statutes in effect at the date of injury apply to the rights of all parties in any claim for workers' compensation benefits. *Helms v. Lynn's, Inc.*, 1996 SD 8, ¶ 11, 542 N.W.2d 764, 766. In December 1990, SDCL 62–1–1 defined "injury" or "personal injury" as "only injury arising out of and in the course of the employment, and shall not include a disease in any form except as it shall result from the injury."

[¶ 21.] In a case such as this, the testimony of professionals is crucial in establishing that the employment was "a contributing factor" to the injury complained of

> because the field is one in which [laypersons] ordinarily are unqualified to express an opinion. Unless its nature and effect are plainly apparent, an injury is a subjective condition requiring an expert opinion to establish a causal relationship between the incident and the injury or disability. A [claimant's] compensation award cannot be based on possibilities or probabilities, but must be based on sufficient evidence that the claimant incurred a disability arising out of and in the course of [the claimant's] employment. Medical testimony to the effect that it is possible that a given injury caused a subsequent disability is insufficient, standing alone, to establish the

causal relation under [workers'] compensation statutes.

*Day v. John Morrell & Co.*, 490 N.W.2d 720, 724 (S.D.1992). What, then, did the various experts have to say about Rawls's condition? Psychiatrist Burnap, who began examining Rawls more than eight years after the trap-door incident, opined that her accident at C–F was "the primary causative factor" of her then-current symptoms. He based that opinion on his examination of Rawls's medical records.

[¶ 22.] Rheumatologist Weaver diagnosed Rawls as suffering from fibromyalgia (not myofascial-pain syndrome), but was unable to rule out any of several possible causes and indeed admitted that the cause of that affliction is unknown.[8] Physiatrist Goff, who, not knowing of Rawls's injured rotator cuff, pronounced her as having achieved maximum medical improvement as early as November 1991, diagnosed her as suffering from myfascial-pain syndrome. He also asserted that he agreed with Dr. Weaver's assessment (though she did not agree with his), and affirmed that "we [in the medical profession] don't know what fibromyalgia is." He offered an opinion on causation, with the vague assertion that "there has been established an association between [trauma and fibromyalgia]." Neurologist Hata attributed Rawls's balance problems to her "postural derangements," but did not offer an opinion that the cause of this problem was specifically the fall through the trap door. Physiatrist Goff also addressed Rawls's balance problems. He believed that injuries to the neck can cause balance problems, but could not affirm that an injury to Rawls's neck did cause her balance problems, let alone the necessary antecedent fact that the trap-door incident caused her to suffer a neck injury. At most, Goff testified that the numerous tests to which Rawls submitted ruled out a number of other causes.

[¶ 23.] When asked for her opinion, to a reasonable degree of medical probability, that the original injury caused or contributed to developing fibromyalgia, Dr. Weaver answered: "If [Rawls] had a cervical strain, which Dr. Goff states that she did when he saw her a month later, if she had a whiplash type injury at the time, that does seem to be associated with developing fibromyalgia, yes." In giving his opinion on the causation of the myofacial pain, Dr. Goff testified that "the syndrome complex that she's now experiencing is a domino effect of the injury she sustained when she fell through the trap door." Yet, with the current lack of medical knowledge in the area, which both Drs. Weaver and Goff acknowledged, such opinions are at least open to doubt.

8. One court defines fibromyalgia as "an affliction in which inflammation of the muscles and the fibrous covering of the muscles causes chronic pain." *Ex parte Kmart Corp.*, 812 So.2d 1205, 1206 (Ala.2001). According to the 2001 Mayo Foundation for Medical Education and Research (MFMER), it is "a chronic condition characterized by fatigue and widespread pain in the fibrous tissues in one's muscles, ligaments, and tendons." *See also* Webster's Medical Dictionary (1996), *and* The Merck Manual of Diagnosis and Therapy (17th ed 1999). Several courts acknowledge that the medical profession has not been able to establish a precise etiology for fibromyalgia. *See Safeway, Inc. v. Mackey*, 965 P.2d 22, 27 (Alaska 1998); *Waldorf Corp. v. Indus-trial Comm'n*, 303 Ill.App.3d 477, 236 Ill.Dec. 890, 708 N.E.2d 476, 480 (1999). In the latter case, one physician testified that, in his own experience, some 25% of the 500–1000 patients he had treated for fibromyalgia began to experience its symptoms "after an injury at work." *Id.* at 480. Frequently, if not always, fibromyalgia "is a condition manifested solely by subjective complaints of the patient." *Id.* at 481. The South Dakota Department of Labor has rejected fibromyalgia as compensable as a matter of law. *Duchscher v. Rushmore Plaza Holiday Inn and Kemper Nat'l. Ins. Cos.*, HF No. 450, 1992/93. This Court has, to date, made no ruling on the question.

**254**

[¶ 24.] Weaver conceded that she could not "say that other things did not cause it, too." "We don't know the cause and effect," she testified. Goff admitted that there exists an ongoing debate in the medical community over the association of trauma and fibromyalgia. It is true that, as we have recognized, the Department cannot arbitrarily ignore uncontroverted expert testimony. *Foltz v. Warner Transp.*, 516 N.W.2d 338 (S.D.1994). Here, although the only medical opinions offered were those rendered by experts for Rawls, the ALJ was not bound to accept them reflexively, without considering the basis for the opinions and the expertise of the persons giving them. And because these diagnoses were based on subjective complaints, the ALJ was entitled to consider Rawls's own account of her symptoms and her inconsistent history. With such concerns, we cannot say that the ALJ committed clear error in rejecting these opinions about illnesses of unknown etiology and in concluding that Rawls had failed to show that her partial fall through the open trap door was a contributing factor in her condition.[9] Accordingly, we affirm the Department's ruling on this issue.

[¶ 25.] As to the second issue, whether Rawls is entitled to additional disability benefits, we affirm the rulings below. Since Rawls did not prevail on the first issue, she cannot prevail on the second.

[¶ 26.] Affirmed.

[¶ 27.] GILBERTSON, Chief Justice, and SABERS, Justice and AMUNDSON, Retired Justice, and MARTIN, Retired Circuit Court Judge, sitting by Order of the Court, concur.

[¶ 28.] MARTIN, Retired Circuit Court Judge, sitting for ZINTER, Justice, disqualified.

---

9. We are not here implying that we would require a complete understanding of the etiology of fibromyalgia to hold that, in a given case, a work-related injury was a contributing factor to that affliction. "A finding that a disease is work-connected will not be reversed as being based on speculation and conjecture merely because the medical profession does not fully understand the etiology of the disease." *Certi–Serve, Inc. v. Industrial Comm'n*, 101 Ill.2d 236, 78 Ill.Dec. 120, 461 N.E.2d 954, 958 (1984) (quoting A. Larson, Workmen's Compensation § 80.31(c) (1983)).

In our case, for Rawls to prevail, she must make a *lesser* showing (which she failed, through expert testimony, to make) that, by a preponderance of the evidence, her workplace accident was a contributing factor to her injury, *not* the *greater* showing of the precise, detailed manner in which the accident caused the injury. The *Waldorf* court puts the matter succinctly: "while the etiology of fibromyalgia is unknown, that fact does not compel the conclusion that the claimant was incapable of proving a causal connection." 708 N.E.2d at 481.