#25906-rev & rem-JKK
**2011 S.D. 61**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

DAVID THYEN                                    Claimant and Appellant,

    v.

HUBBARD FEEDS, INC.,                           Employer and Appellee,

and

SENTRY INSURANCE,                              Insurer and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT L. TIMM
Judge

* * * *

RONALD L. SCHULZ
Watertown, South Dakota                        Attorney for claimant
                                     and appellant.

MICHAEL S. MCKNIGHT
WILLIAM J. GASSEN III of
Boyce, Greenfield, Pashby & Welk, LLP
Sioux Falls, South Dakota                      Attorneys for employer,
                                     insurer, and appellees.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 22, 2011

OPINION FILED **09/21/11**

KONENKAMP, Justice

[¶1.]     In this workers' compensation appeal, we reverse and remand for a new hearing before the Department of Labor to consider the employee's claim that the employer intentionally destroyed relevant evidence that would have assisted the employee in establishing causation for his injuries.

## Background

[¶2.]     Claimant, David Thyen, has worked for Hubbard Feeds, Inc. since January 30, 2003, as a mix operator.  In addition to his work at Hubbard, Thyen and his wife ran a small dairy farm.  On July 2, 2008, before going to work, Thyen helped his wife feed the dairy cows by mixing the feed and driving it to the feed bunks with a skid-steer loader.  After finishing, Thyen arrived at Hubbard for work at 9:00 a.m.  He was asked to monitor the flow of wheat middlings being removed from a tank that had accidentally become contaminated with a load of limestone the previous day.  While monitoring the flow, he also cleaned up an area near the "meat and bone tank" where old feed had spilled and become moldy and "raunchy smelling."  Shortly thereafter, Thyen felt his face turn red and "burn red hot."  He immediately went inside the plant and threw cold water on his face.  But the cold water did not help, and within minutes his stomach, arms, hands, legs, and neck were hot and tingling, with a pins-and-needles burning sensation.

[¶3.]     Hubbard's plant manager took Thyen in a work vehicle to the Brown Clinic in Watertown.  There, Thyen began to shake uncontrollably.  Dr. Allison Geier diagnosed an allergic reaction, and treated him with an epinephrine injection, along with benadryl and solumedrol by IV.  Thyen's redness lightened, but he

continued to shake. He was transferred to Prairie Lakes Hospital and admitted for observation. He was released on July 3, 2008.

[¶4.]     Dr. Geier made an appointment for Thyen to see Dr. Kenneth Rogotzke, an ear, nose, and throat doctor, for allergy testing on July 10, 2008. Dr. Rogotzke believed Thyen experienced "an anaphylactic event or angioneurotic edema event." He asked Thyen to obtain a Materials Safety Data Sheet (MSDS) from Hubbard, listing the ingredients stored or used at Hubbard. On July 16, 2008, Thyen's daughter brought him to Hubbard to retrieve the MSDS. Upon entering the office, he experienced symptoms similar to those on July 2, 2008. His daughter drove him to Dr. Rogotzke's office. Dr. Rogotzke was not available, but his office contacted him by phone. Thyen injected himself with epinephrine, and returned the next day to see Dr. Rogotzke. Dr. Rogotzke referred him to an allergist in Sioux Falls.

[¶5.]     On July 22, 2008, Thyen saw Dr. Brian Brennan. Dr. Brennan examined Thyen and reviewed his history. In his report, Dr. Brennan wrote, "At this time I am at a loss for determining the cause of this from his history." He added,

> Perhaps a pesticide exposure could cause symptoms such as this, but also symptoms of pesticide exposure are lacking and there is no history of pesticide exposure. This could represent a flushing syndrome, but again, many of the symptoms are lacking. Certainly, some of this flushing could be related to his Niacin therapy but at this time it is unclear whether he was taking Niacin on the dates of these reactions.

Dr. Brennan referred Thyen to the Mayo Clinic.

[¶6.] On July 28, 2008, Thyen was seen by Dr. Joseph Butterfield at the Mayo Clinic for an allergy consultation. After examining Thyen, Dr. Butterfield decided to "check allergy skin tests to common inhalants and molds." But Dr. Butterfield "informed Mr. Thyen that we [Mayo] do not have tests for any of the 250 additives in grains which he mixes." He diagnosed a flushing episode and hypertension. At a follow-up visit on September 5, 2008, Dr. Butterfield told Thyen that the skin tests for mold came back negative.

[¶7.] Thyen was again examined by Dr. Rogotzke on August 22, 2008. In his report, Dr. Rogotzke wrote, "The question is whether this is inhalant or chemicals. This would be hard to prove the chemicals. Certainly seems to be work related in my mind. I got to see the second episode and that was to me very profound. It mimicked the first reaction he had."

[¶8.] Dr. Douglas Pay with Avera Dermatology examined Thyen on August 25, 2008. Dr. Pay diagnosed Thyen with "[o]ccupational dermatitis secondary to work related exposure, exact etiology undetermined at this time." He referred Thyen to "occupational health." On August 25, 2008, Dr. Bruce Elkins, a certified medical examiner, provided a second opinion. He examined Thyen, his history, the MSDS, and opined that "[t]he most likely explanation for Mr. Thyen's symptoms is an unrecognized workplace exposure." In particular, Dr. Elkins believed that the insecticide Tempo could cause symptoms such as Thyen's and that "additional information regarding potential exposure to Tempo still needs to be explored." He recommended that Thyen follow up with an allergist for additional testing.

[¶9.]        Thyen saw allergist Dr. Mark Bubak on September 10, 2008. Dr. Bubak reported, "I am unable to give an allergic reaction for this and unfortunately I do not know enough about toxic mold exposures to say that is what happened to him either. It is unusual that just going to the office would have a similar flushing episode." Dr. Bubak concluded, "I am unable to give worthwhile recommendations at this point[.]"

[¶10.]       Thyen submitted his first report of injury to Hubbard on July 3, 2008. On August 22, 2008, Hubbard's insurer, Sentry Insurance, sent Thyen a conditional denial of his claim. Thyen then asked Hubbard to provide him with random samples of various materials in the areas around the plant. The first request came by prescription from Dr. Geier in August 2008, for "samples of areas pt [patient] in contact with prior to reaction – at least 10 places & clothing if needed." Hubbard refused to give Thyen a sample because no protocols were in place. Then, in September 2008, Thyen gave Hubbard another prescription from Dr. Geier, which provided a collection protocol and collection boxes. Hubbard did not collect the requested samples. In a letter dated October 6, 2008, Hubbard acknowledged Thyen's request for samples and again denied his request. On November 5, 2008, Thyen returned to work at Hubbard. In a letter from the human resources manager, Hubbard instructed Thyen that he was "not to remove from the plant any property, products or other items belonging to the Company" or his job would be terminated.

[¶11.]　　　　On October 15, 2008, Thyen petitioned the Department of Labor for a hearing on his workers' compensation claim. In preparation for the hearing, his attorney provided a letter to the Department:

> Claimant has made a request of his employer to obtain samples of the materials that he was exposed to and the employer has denied his request. We believe that the temperature around July 2 and July 16, 2008 caused a toxic situation and it is our understanding that the work area is in the same condition today as it was on those dates. We expect that a like condition will occur when the temperature reaches the same degree in 2009 as it did on those days. Claimant would like the opportunity to obtain samples for analysis assuming the employer does not clean up the work area. Counsel for Employer and Insurer has indicated to me [counsel for Thyen] that sampling will be allowed.

Hubbard never allowed Thyen to obtain samples and no testing was done because Hubbard cleaned up the spilt moldy feed on June 26, 2009. Hubbard brought Thyen's empty collection boxes to the hearing.

[¶12.]　　　　At the hearing in January 2010, Thyen, his wife, and his daughter testified, while the testimony of Dr. Rogotzke and Dr. Beth Baker (Hubbard's independent medical examiner) were submitted by deposition. The parties stipulated to the admission of Thyen's medical records. Following the hearing, the Department ordered the parties to submit briefs. In Thyen's brief, he asserted that his injury arose out of and in the course of his employment. He further asserted that Hubbard agreed to allow him to obtain samples, but then cleaned up the plant area without allowing sampling.

[¶13.]　　　　On August 4, 2010, the Department issued a letter decision holding that Thyen "failed to demonstrate that he sustained a compensable injury arising out of and in the course of his employment." It concluded that Thyen only offered

evidence of a temporal sequence, assigning blame because the injury occurred at work. No expert testified on what exactly caused the injury, only that it was likely work related. Although the Department found that Hubbard's "action[s] showed a total disregard for [Thyen's] health, the health of its other employees and its customers" because it "did not make a greater effort to collect samples to test for toxins," the Department concluded Hubbard's failure did not alter or shift Thyen's burden to prove causation. It later issued findings of fact, conclusions of law, and an order denying Thyen's workers' compensation claim. The circuit court affirmed the Department's decision. Thyen appeals to this Court.

## Analysis and Decision

[¶14.] To recover on a workers' compensation claim, Thyen must establish by a preponderance of the evidence that he sustained an injury arising out of and in the course of his employment at Hubbard. *See* SDCL 62-1-1(7); *Rawls v. Coleman-Frizzell, Inc.*, 2002 S.D. 130, ¶ 20, 653 N.W.2d 247, 252 (citation omitted). But Thyen contends that his efforts to prove causation were thwarted by Hubbard's refusal to allow collection of samples and its later destruction of potential samples. Hubbard responds that Thyen waived the issue of spoliation of evidence because he did not specifically present the issue to the Department or the circuit court.

[¶15.] Our review of the record indicates that the issue was raised and preserved. Thyen did not use the word "spoliation," but he clearly placed the issue of Hubbard's evidence destruction before the Department. Counsel for Thyen wrote the Department seeking to schedule the hearing after Thyen obtained samples of the materials he was exposed to because Hubbard gave Thyen permission to obtain

the samples. Then, during the hearing, Thyen submitted testimony and documentary evidence about his efforts in obtaining samples. He entered into evidence two prescriptions from Dr. Geier requesting samples from Hubbard. He testified that Hubbard twice denied his requests, with one denial established by a letter from Hubbard. Thyen also entered into evidence the letter he was asked to sign, agreeing that upon returning to work he would not obtain or take any property from Hubbard. Finally, during the hearing, Hubbard and Thyen stipulated that Hubbard gave Thyen permission to obtain samples, and that no samples were obtained because Hubbard cleaned up the area.

[¶16.] Spoliation is the intentional destruction of evidence. *State v. Engesser*, 2003 S.D. 47, ¶ 44, 661 N.W.2d 739, 753; *State v. Kietzke*, 85 S.D. 502, 514-15, 186 N.W.2d 551, 558 (1971). "When it is established, a fact finder may infer that the evidence destroyed was unfavorable to the party responsible for its destruction." *Engesser,* 2003 S.D. 47, ¶ 44, 661 N.W.2d at 753. Although this Court has predominately addressed spoliation in criminal cases, we recognized in *Engesser* that the rule applies with equal force in civil cases. *Id.* ¶ 45 (citing *Spesco v. Gen. Elec. Co.,* 719 F.2d 233 (7th Cir. 1983)); *see also Richter v. City of Omaha*, 729 N.W.2d 67, 72 (Neb. 2007); *Manpower, Inc. v. Brawdy*, 62 P.3d 391, 392 (Okla. Civ. App. 2002); *Morris v. J.C. Penney Life Ins. Co.*, 895 S.W.2d 73, 77 (Mo. Ct. App. 1995). Spoliation is established along with an unfavorable inference against the spoliator "when substantial evidence exists to support a conclusion that the evidence was in existence, that it was in the possession or under the control of the party against whom the inference may be drawn, that the evidence would have been

admissible at trial, and that the party responsible for destroying the evidence did so intentionally and in bad faith." *Engesser,* 2003 S.D. 47, ¶ 46, 661 N.W.2d at 755. *Cf. Wal-Mart Stores, Inc. v. Johnson,* 106 S.W.3d 718, 721-22 (Tex. 2003).

[¶17.]    Because the Department failed to properly consider the spoliation question, Thyen is entitled to a new hearing before the Department so that the issue can be determined and the negative inference applied if it is established that spoliation occurred.

[¶18.]    Reversed and remanded.

[¶19.]    GILBERTSON, Chief Justice, and ZINTER and SEVERSON, Justices, concur.

[¶20.]    WILBUR, Justice, did not participate.