2003 SD 47

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Oakley B. ENGESSER, Defendant and Appellant.**

**No. 22149.**

Supreme Court of South Dakota.

Argued Oct. 8, 2002.

Reassigned Jan. 10, 2003.

Decided April 23, 2003.

Lawrence E. Long, Attorney General, Sherri Sundem Wald, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Timothy J. Rensch, Rapid City, South Dakota, Attorney for defendant and appellant.

KONENKAMP, Justice (on reassignment).

[¶ 1.] Defendant was tried by a jury and convicted of vehicular homicide and

two counts of vehicular battery. He was sentenced to prison. He appeals asserting that the trial court erred in (1) denying the suppression of his blood draw result; (2) allowing a police officer to testify whether he thought defendant was untruthful during an interview; (3) refusing hearsay evidence; and (4) failing to instruct the jury on spoliation. We affirm on all issues.

**Background**

[¶ 2.] In the early evening of July 30, 2000, the defendant, Oakley B. Engesser, and Dorothy Finley were at the Full Throttle Saloon, near Sturgis, South Dakota. Roanna Clifford visited with Finley for approximately 30 to 45 minutes. She did not see Finley drink any alcoholic beverage, but noticed that Engesser was drinking beer. Through the course of the conversation, Finley said that she and Engesser had her red Corvette. Although she did not see Engesser and Finley leave the Full Throttle, Clifford estimates that they left at approximately 6:00 p.m.

[¶ 3.] Between 7:30 and 7:45 p.m. that same evening, Beau Goodman was driving east on Interstate 90 when he saw a red Corvette entering the Interstate a few hundred feet behind his vehicle. Goodman estimates that he was traveling between 75 to 80 miles per hour. When he looked into his rearview mirror, he could not see the red Corvette. Then, he looked to his side and saw the Corvette zip by him. Describing the car as a "red blur," Goodman was unable to see who was driving. As the Corvette raced down the road, Goodman saw it slam into the back end of a white minivan. The collision occurred at approximately 8 p.m.

[¶ 4.] In the white minivan were Todd and Jackie McPherson, along with their two children, three-year-old Cassie and one-year-old Alex. They were traveling eastbound on Interstate 90 between Sturgis and Rapid City. Todd was driving. He had the cruise control set at 70 to 75 miles per hour. The only passenger in a seatbelt was Alex, who was riding in his car seat. As they were driving, the McPhersons noticed that two vehicles ahead pulled onto the shoulder of the interstate. Consequently, Todd pulled into the left lane. At this point, he described the traffic flow as ordinary, explaining that all the vehicles appeared to be traveling at the same pace. After he passed the parked vehicles on the shoulder of the road, Todd moved back into the right lane. Checking his rearview mirror, Todd did not see any vehicles approaching at a fast rate of speed.

[¶ 5.] Just beyond the parked vehicles, Todd felt a tremendous impact when his vehicle was hit from behind by the red Corvette. As the minivan careened into the ditch, Todd was thrown from the driver's seat to the back of the van, landing with his head in the backseat and his feet facing the driver's seat. Jackie remained in the front passenger seat, her right leg wedged between the seat and the door. Cassie, who had been sitting on Jackie's lap, was also thrown to the backseat of the van. She had shattered glass all over her head and dress. Jackie reached over and turned off the ignition. She was also able to push her door open. Once out of the car, she was unable to open the side door of the van, so she reached inside the broken windows and pulled her children from the vehicle. Initially, Todd was pinned inside. He was eventually able to free himself and climb out of the van. Cassie complained that her leg hurt and Jackie also noticed a large bump on Cassie's head. Todd was transported to the hospital in Rapid City, where he was diagnosed with broken ribs, whiplash, a bruised ankle, and body stiffness. Jackie was also diagnosed with severe whiplash. That same evening, Jackie and Cassie were re-

leased from the hospital, but Todd remained there for four days.

[¶ 6.] According to the State's accident investigator, the Corvette was traveling approximately 112 miles per hour when it slammed into the back of the minivan, spun off the road, and rolled several times before coming to rest on its roof in the median. The passenger side of the Corvette was crushed on impact with the minivan. Engesser was thrown from the car and was found face down in the grass six to ten feet away from the open driver's door of the car. One of the first people on the scene was Mary Redfield, an off-duty emergency room nurse. Using her medical training, Redfield cleared Engesser's airway, allowing the unconscious man to breathe. The nurse noted that Engesser had a strong pulse. As she continued to aid Engesser, she noticed that he had a gash on the right side of his head. She also noticed that he had the odor of an alcoholic beverage. Engesser was taken by ambulance to the hospital.

[¶ 7.] Finley was trapped inside, on the passenger side of the Corvette. She was pronounced dead at the scene. Mike Walker, a Meade County Deputy Sheriff, arrived on the scene. After checking on the McPhersons, he walked over to the Corvette where he had been informed that there had been a fatality. Crawling inside the open driver's door, Walker checked Finley's pulse. With the car lying on its roof, he found Finley's body underneath the passenger seat, her body in line with the seat. The upper part of Finley's body was lying over the top of the seat. She was facing the ground. Her feet were underneath the dash. Her face was pointing toward the driver's side. Shortly thereafter, emergency workers used the Jaws of Life tool to extract Finley from the wreckage. Her body was removed through the driver's door because the passenger side of the vehicle was so damaged the passenger side door could not be opened.

[¶ 8.] The officer designated to lead the investigation was Trooper Ed Fox of the South Dakota Highway Patrol. Preliminary information given to Fox erroneously reported that Finley was found in the driver's seat and his initial report reflected that information.[1] Fox inspected the passenger compartment of the car to determine whether there was any blood or trace evidence. It was dark and he was unable to see any blood. He ordered the vehicle impounded to test it for trace evidence, including blood.

[¶ 9.] After investigation at the scene, Fox went to the hospital to interview Engesser. Having suffered a head injury, Engesser was combative and incoherent. The only coherent thing Engesser said to the trooper was that he had not been driving. Smelling the odor of an alcoholic beverage on Engesser, Fox ordered a blood draw to determine his blood alcohol concentration (BAC). Fox did not read the implied consent warning to Engesser. The officer was unsure who had been the driver. At the time of the test, Engesser was not in custody or detained by the officer; in fact, he was not arrested until

---

**1.** Although a paramedic had initially misinformed Fox that Finley had been found in the driver's seat, the paramedic soon corrected that information and reported that Finley had been found in the passenger seat. Later that evening, Fox filled out a major accident report in which he listed Finley as the driver, but noted that information pertaining to the actual driver had not yet been confirmed. Fox believed that an additional investigation into who was the actual driver would be necessary. At trial, Fox testified that he initially listed Finley as the driver because she was the owner of the Corvette and was its regular driver.

approximately seven months later. The test later revealed that Engesser's BAC was .081. Extrapolated back to the time of the accident, the BAC would have been .125, according to the chemist who testified for the prosecution.

[¶ 10.] Meanwhile, the Corvette was taken to a private lot where it was left outdoors and uncovered through the time of the trial. The first attempt at an in-depth inspection of the vehicle took place approximately three weeks after the accident when the State's expert went to the lot.[2] Fox had requested that the State Crime Lab examine the vehicle to attempt to determine placement of individuals in the car through blood or trace evidence. The State's expert testified that he did not find any blood in the car and only a trace amount on the roof. He decided that because the vehicle had rolled, the value of any blood that could be found in the vehicle was diminished. Instead, the expert decided to seek an accident reconstruction.

[¶ 11.] On September 13, 2000, Fox contacted Engesser and interviewed him in Fox's cruiser. The interview was videotaped. The following day, Fox finished his report, concluding that based on Finley's injuries, he believed Engesser was the driver. In February 2001, Engesser was charged with vehicular homicide under SDCL 22–16–1, an alternative charge of second degree manslaughter, and two counts of vehicular battery under SDCL 22–16–42.

[¶ 12.] Before trial, the defense gave notice of intent to use exculpatory hearsay. The proffered evidence was the testimony of Engesser's civil attorney who was prepared to testify that he had interviewed Sean Boyle, a security guard at the bar where Finley and Engesser spent time the evening of the accident. The attorney would testify that an interview over the phone with Boyle revealed that Finley had been driving at the time the two left the bar and further, that Finley rarely, if ever, allowed others to drive her Corvette. The trial court refused to admit this hearsay.

[¶ 13.] The defense also moved to suppress the result of Engesser's BAC. The trial court denied the motion. Engesser proposed two jury instructions dealing with the State's duty to preserve evidence and the inferences that may be drawn from failure to do so. Both jury instructions were rejected. Engesser was convicted of vehicular homicide and two counts of vehicular battery. He was sentenced to fifteen years in prison for the homicide conviction and ten years each on the two convictions of vehicular battery. The ten-year sentences were to run concurrently, with the fifteen-year sentence running consecutively. Thus, he received a total of twenty-five years in the penitentiary.

[¶ 14.] Engesser appeals, raising four issues: (1) Whether the trial court abused its discretion in denying suppression of the result of the blood draw taken "without consent, without reading the implied consent [warning], and without detention or custody." (2) Whether the trial court abused its discretion "in allowing the State to elicit answers from Trooper Fox identifying which statements of defendant he believed were untruthful when defendant did not testify." (3) Whether the trial court abused its discretion by "disallowing the use of exculpatory hearsay." (4) Whether the trial court abused its discretion and denied the defendant due process

2. Shortly after the accident, Finley's family visited the lot where the Corvette was taken. At trial, testimony revealed that it was Finley's habit to take the strap of her purse and wrap it around the purse and place the purse down by her feet. Finley's purse was found underneath the dash of the passenger side of the car.

in failing to give instructions on the duty to preserve evidence and spoliation.

## Analysis and Decision

[¶ 15.] Our standard of review is abuse of discretion for rulings on motions to suppress, *State v. Nguyen*, 1997 SD 47, ¶ 9, 563 N.W.2d 120, 122 (citations omitted), for decisions on admissibility of evidence, *State v. Rhines*, 1996 SD 55, ¶ 133, 548 N.W.2d 415, 446, for requests to give proposed jury instructions, *State v. Wright*, 1999 SD 50, ¶ 12, 593 N.W.2d 792, 797 (citation omitted), and for offers of opinion evidence. *State v. Guthrie*, 2001 SD 61, ¶ 30, 627 N.W.2d 401, 415. If no judicial mind, in view of the law and circumstances of the particular case could have reasonably reached the same conclusion, then there was an abuse of discretion. *Gilkyson v. Wheelchair Express, Inc.*, 1998 SD 45, ¶ 6, 579 N.W.2d 1, 3 (citations omitted). A finding of probable cause is reviewed de novo. *State v. Lorenz*, 2001 SD 17, ¶ 4, 622 N.W.2d 243, 244.

### 1. Admission of Blood Test Result

[¶ 16.] The state may require an individual to submit to a test of bodily fluids as long as it acts within constitutional limitations. In determining whether the taking of a blood sample violated the Fourth Amendment, we look first to the United States Supreme Court's seminal decision in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). *State v. Hanson*, 1999 SD 9, ¶ 28, 588 N.W.2d 885, 891. In *Schmerber*, the Court narrowly limited its holding to the facts of the case. 384 U.S. at 772, 86 S.Ct. at 1836, 16 L.Ed.2d at 920. Under the *Schmerber* standard, we have held that law enforcement may seize a blood sample only if it is taken (1) incident to a lawful arrest; (2) by a reliable and accepted method for obtaining the sample; (3) in a reasonable, medically approved manner; and (4) where

there is probable cause to believe the evidence sought exists. *Hanson*, 1999 SD 9, ¶ 28, 588 N.W.2d at 891.

[¶ 17.] Here, there is no dispute about the second and third factors. The questions are whether the Fourth Amendment was violated when the draw was taken without an arrest and whether the officer had probable cause to seize the blood evidence. We begin by examining whether the officer had probable cause.

[¶ 18.] The trial court concluded that the officer had probable cause, relying on the following circumstances:

emergency room, late night, on a weekend, three hours ... post accident, one almost incoherent suspect who smells strongly of alcohol, one suspect dead as a result of a two vehicle, high speed fatality accident on a public highway resulting from an unsuccessful passing maneuver, suspect one alive, taken directly from the scene to the ER via ambulance, any alcohol in suspect one's blood is dissipating, tick, tick, tick[.]

[¶ 19.] The defendant argues that probable cause did not exist because the trooper himself did not believe he had probable cause and the defendant was not placed under arrest at the time. He further contends that no one had seen him driving and the information available to Fox at the time (per his initial report) was that Finley owned the vehicle and that she had been the driver.

[¶ 20.] Probable cause is a question of law; the trial court must measure it against an objective standard. *State v. Lamont*, 2001 SD 92, ¶ 21, 631 N.W.2d 603, 610 (citations omitted). Fox's subjective beliefs or ideas about who was driving or whether he had probable cause are individual factors to be considered in the totality of circumstances. The conditions justifying an officer's actions need not be the

circumstances forming the officer's state of mind at the time the action is taken. *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168, 178 (1978). "[A]s long as the circumstances, viewed objectively, justify [the] action," probable cause may be found. *Id.* Here, Engesser was found outside the driver's side door, Finley was inside the vehicle, and the passenger door could not be opened. In addition, Engesser's breath smelled of an alcoholic beverage. Engesser has shown no error in the trial court's determination that the objective circumstances amounted to probable cause to believe that a crime may have been committed and that the blood test would uncover relevant evidence of the crime.

[¶ 21.] The next question is whether the blood draw was "incident to" arrest or, more to the point, whether a formal arrest is necessary in all circumstances. As a threshold matter, we have never held that a decision to make an arrest must come before a blood sample is taken. In fact, we have specifically found that there is no such requirement. *Nguyen*, 1997 SD 47 at ¶ 20, 563 N.W.2d at 125; *see also Rawlings v. Kentucky*, 448 U.S. 98, 110–11, 100 S.Ct. 2556, 2564–65, 65 L.Ed.2d 633, 645–46 (1980). Nonetheless, a blood draw done seven months before an arrest is not "incident to" that arrest.

[¶ 22.] *Schmerber* was undeniably couched in terms of a search incident to arrest. The Court stated that its holding was based solely on the specific facts presented in the case, one of which was that the defendant was under arrest at the time of the search. *Schmerber*, 384 U.S. at 772, 86 S.Ct. at 1836, 16 L.Ed.2d at 920. However, the holding in *Schmerber* did not turn solely on the existence of a valid prior arrest. Rather, the Court relied heavily on the evanescent nature of blood alcohol and the danger that important evidence would be forever lost, creating exigent circumstances under which the blood draw was appropriate. 384 U.S. at 770–771, 86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d at 919–920. This reading of *Schmerber* is reinforced by the Court's subsequent decision in *Winston v. Lee*, which noted that the blood test in *Schmerber* "fell within the exigent circumstances exception to the warrant requirement." 470 U.S. 753, 759, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662, 668 (1985). But we are not limited to *Schmerber's* holding. Later Supreme Court decisions make it clear that formal arrest is not always required.

[¶ 23.] Seven years after the Court decided *Schmerber*, it handed down *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). In *Cupp*, a husband was brought to the station house for questioning after his wife was strangled. During questioning, the officers noted a dark stain on the husband's fingernails. Knowing that evidence of strangulation can often be found under the perpetrator's fingernails, the officers took scrapings from the husband's fingernails over his protest, without arrest and without a warrant. *Id.* at 292, 93 S.Ct. at 2002, 36 L.Ed.2d at 903–04. The Court found no violation of the Fourth Amendment and held that a warrantless body search may be conducted despite failure to formally arrest the suspect, when (1) the character of the search is highly unintrusive; (2) the evidence sought will be forever lost absent the search; and (3) sufficient probable cause exists to support a formal arrest. *Id.* at 296, 93 S.Ct. at 2004, 36 L.Ed.2d at 906. We find *Cupp* to be controlling.

[¶ 24.] Although the search in *Cupp* was arguably less intrusive than the taking of a blood sample, blood "tests are [ ] commonplace in these days of periodic physical examination and experience [ ] teaches that the quantity of blood extracted is minimal, and that for most people the

procedure involves virtually no risk, trauma, or pain." *Schmerber,* 384 U.S. at 771, 86 S.Ct. at 1836, 16 L.Ed.2d at 920. As in *Schmerber,* the defendant here is not "one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing[.]" *Id.* Engesser was already in the hospital being treated for serious injuries and the record indicates that other blood tests were being done. This blood seizure here meets the first prong of *Cupp.*

[¶ 25.] We have consistently acknowledged the highly evanescent nature of blood alcohol. It is undeniable that the simple passage of time obliterates this valuable evidence. Lacking a blood draw within a relatively short time, law enforcement officers cannot confirm the driver's level of impairment at the time he or she was driving. Three hours had already elapsed since the accident when Engesser's blood was drawn. The more time that went by the less likely the evidence could be obtained at all. Evidence of Engesser's intoxication would have been "forever lost" without the blood draw.

 [¶ 26.] Finally, we come again to the issue of probable cause. As noted above, it is not the subjective beliefs of the officer but rather the objective circumstances from which we determine the existence of probable cause. At the time the blood was drawn, the following facts existed:

(1) Engesser was found lying approximately 10 feet from the *driver's side* door of the Corvette.

(2) Emergency crews used the Jaws of Life to extricate Finley from the *passenger side* of the vehicle.

(3) Finley was deceased.

(4) The nurse who attended Engesser at the scene noticed an odor of alcoholic beverage coming from him.

(5) Fox noted a strong odor of alcohol beverage coming from Engesser.

(6) The car had been traveling at an extremely high rate of speed.

Considering these facts, we conclude that there was probable cause to arrest Engesser. The determinative question in this case is not whether there was an actual arrest, but rather whether the trooper had probable cause to arrest the defendant. He did and therefore this search was reasonable.[3]

[¶ 27.] In this case, to insist on a requirement of a formal arrest makes little sense. Throughout his brief, Engesser strenuously asserts that he was incoherent at the time Fox ordered the blood draw. Had the trooper gone through with the formalities of arrest, Engesser may not have even known he was under arrest. In addition, requiring Fox to perform the ritual of formal arrest at a time when the suspect was still incoherent would have

---

**3.** If every blood draw in a vehicular homicide investigation had to be taken incident to a formal arrest, the ability of officers to enforce our laws prohibiting driving under the influence resulting in death would be thwarted. The Fourth Amendment neither permits nor prohibits these types of intrusions absolutely. The Amendment's "... proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Schmerber,* 384 U.S. at 768, 86 S.Ct. at 1834, 16 L.Ed.2d at 918. Society's "interest [ ] in conducting the proce-

dure" is to be weighed against the "individual's interest in privacy and security." *Winston,* 470 U.S. at 760, 105 S.Ct. at 1616, 84 L.Ed.2d at 669. Society has an important interest in determining guilt or innocence. *Id.* at 762, 105 S.Ct. at 1618, 84 L.Ed.2d at 670. The blood test is probably the most accurate means of determining intoxication and "courts and juries should not be denied probative evidence unless it was procured in violation of the rights of the accused." *United States v. Chapel,* 55 F.3d 1416, 1418 (9th Cir.1995).

done nothing to increase Engesser's protection under the Fourth Amendment.

[¶ 28.] When there are exigent circumstances such as those in this case, and where the police officer has both probable cause on which to believe the test will produce evidence of an offense and probable cause to arrest the subject, it does not violate the Constitution if blood is drawn without a prior or immediate subsequent arrest.[4]

 [¶ 29.] In summary, for an involuntary, warrantless blood draw to be constitutional, either the search must be incident to arrest or the officer must have: (1) probable cause to arrest; (2) probable cause to believe that the evidence sought will be obtained; and (3) exigent circumstances justifying the intrusion. In any case, the remaining requirements of *Schmerber*—that the test be taken by a reliable and acceptable method and in a reasonable, medically approved manner— must be strictly observed.

### 2. Trooper's Testimony on Defendant's Credibility

[¶ 30.] Although Engesser did not testify in his trial, his entire thirty minute taped interview with Fox was played to the jury. After the tape was played, the trial court allowed Fox to express his opinion on Engesser's truthfulness in the interview, particularly on the part where Engesser asserted that he had not been driving. On direct examination, the State's Attorney and Fox had the following colloquy:

Q: (State's Attorney) When you spoke to the defendant at that September 13th interview you said, "I don't necessarily think you're lying." Did you think he was lying to you?

MR. RENSCH: Objection as to relevancy . . .

THE COURT: Overruled.

A: Yes.

Q: What did you base that on?

A: My experience interviewing people.

Q: Okay. And what about his conversation with you did you—what about that conversation made you believe he was lying?

MR. RENSCH: Objection . . . that's argumentative, it calls for speculation,

---

4. This Court is not alone in holding that the Fourth Amendment does not require that a blood draw invariably be incident to arrest. *See e.g. Chapel*, 55 F.3d at 1419 (9th Cir.1995) (arrest not constitutionally required under *Schmerber*); *United States v. Berry*, 866 F.2d 887, 891 (6th Cir.1989) (reading *Schmerber* as an application of exigent circumstances exception and allowing blood draw of unconscious suspect without arrest); *Mercer v. State*, 256 Ark. 814, 510 S.W.2d 539, 541 (1974) (arrest not necessary where officer had probable cause to arrest at the time of blood draw); *People v. Trotman*, 214 Cal.App.3d 430, 262 Cal.Rptr. 640 (1989) (arrest not a constitutional prerequisite to a blood draw if there is probable cause to believe suspect was driving under the influence and probable cause to believe it will yield evidence of the crime); *People v. Fidler*, 175 Colo. 90, 485 P.2d 725, 727 (1971) (whether suspect was arrested at time of blood draw was irrelevant where officer had probable cause); *Filmon v. State*, 336 So.2d 586 (Fla.1976) (reiterating previous case holding that arrest was not a constitutional prerequisite to blood draw); *State v. Findlay*, 259 Iowa 733, 145 N.W.2d 650, 655 (1966) (allowing warrantless blood draw without arrest when there are exigent circumstances and the suspect is unconscious); *State v. Oevering*, 268 N.W.2d 68, 73 (Minn.1978) (finding *Cupp* controls and allowing blood test without arrest or warrant when there was probable cause to arrest); *State v. Lerette*, 858 S.W.2d 816, 819 (Mo.Ct. App.1993) (finding exigent circumstances exception justified taking blood without arrest); *Aliff v. State*, 627 S.W.2d 166, 170 (Tex.Crim. App.1982) (relying on *Cupp* to justify blood test of semi-conscious suspect who was not under arrest).

and it's more prejudicial than probative, it's the ultimate issue.

(off the record discussion)

Q: I believe my question was, what about the interview made you believe he wasn't telling you the truth?

A: There were numerous things during the interview.

MR. RENSCH: Could I have a standing objection as to those matters, Your Honor?

THE COURT: Yes.

Q: Such as?

A: One thing right off the bat you noted on the interview that before I had even asked him a question he went into a rather lengthy explanation that seemed rehearsed to me . . . and that initially right off the bat struck me because its not often that when you meet with somebody they volunteer a lot of stuff. In fact normally it's just the opposite . . .

Fox then touched on other reasons why he believed Engesser had been lying.[5]

[¶ 31.] The trial court's decision to allow the trooper to express his opinion on the credibility of the defendant's statement is troublesome. Perhaps allowing the officer to explain his reason for telling Engesser that the officer did not think he was lying during his statement may have been the court's initial rationale for allowing this testimony, but what followed went beyond that. Yet, the question remains whether this was reversible error.

[¶ 32.] Several circumstances mitigate the court's error in allowing this line of questioning. First, the grounds counsel now asserts on appeal were not the grounds for objection asserted during the officer's testimony. In trial, counsel objected for the reasons that the trooper's testimony was irrelevant, argumentative, speculative, prejudicial, and conclusory, calling for an ultimate opinion. On appeal, counsel contends that the error was in allowing inadmissible character evidence and an attack on Engesser's reputation for truthfulness. Perhaps the trial court would have been more responsive to those objections had they been made at the time. We have often held that an issue not raised in trial cannot be raised for the first time on appeal. *State v. Hays,* 1999 SD 89, ¶ 16, 598 N.W.2d 200, 203. Thus, largely the issues before us have been waived.

[¶ 33.] Second, to the extent that any complaint for error on this line of questioning remains subject to review, it must be noted that this questioning was for the purpose of allowing the officer to explain why he told Engesser during the interview, I "do not necessarily think you are lying." The purpose was to correct any misimpression the jurors might have taken from the officer's remark, not to give the jury the officer's assessment of Engesser's character or overall credibility. Third, assuming that the general objections were sufficient to preserve the question and assuming that it was improper for the trial court to allow this testimony to go on as it did, not every error warrants a new trial. *State v. Owens,* 2002 SD 42, ¶ 86, 643 N.W.2d 735, 755.

[¶ 34.] A similar error occurred in the second degree murder case of *People v. Allen,* 222 A.D.2d 441, 635 N.Y.S.2d 40 (1995). There, the appellate court con-

---

**5.** Fox testified that he believed Engesser was lying because (1) "[s]everal times during the interview if you pay close attention you'll note that when I ask him a question he will start to answer it and then stop and edit what he was going to say" and (2) with his BAC level, Engesser lied about how much alcohol he consumed on the night in question.

cluded that it was improper for the trial court to permit the prosecutor to ask questions regarding a detective's opinion on the truth of the defendant's statement, effectively allowing the prosecutor to solicit the detective's opinion on the defendant's credibility. However, the court ruled that the error was not reversible per se. Noting the strength of the evidence and the fact that the trial court had admonished the jury that it was the ultimate arbiter of credibility, the *Allen* court found the error harmless.

[¶ 35.] Here, the jurors were instructed that they were the sole judges of the credibility of the witnesses and the weight to be given to their testimony. In the face of this instruction, the notion seems untenable that modern day jurors would acquiesce, sheep-like, in the opinion of a uniformed officer. South Dakota jurors are not likely to surrender their own assessment of the evidence, especially when a court instructs them that it is their duty to decide for themselves. Thus, even if the asserted error here was properly preserved for appeal, the error was harmless. SDCL 23A–44–14 (Rule 52(a)); *cf.* SDCL 15–6–61.

### 3. Refusal of Hearsay

[¶ 36.] The defendant argues that the circuit court abused its discretion by refusing to admit the statement of an unavailable defense witness. Engesser sought to call his civil attorney, Dennis Finch, to testify that Sean Boyle told Finch that he saw Finley and Engesser leave the Full Throttle Saloon and that Finley was driving the Corvette when the two left. Engesser contends that Finch should have been allowed to testify under the "catchall" hearsay exception in SDCL 19–16–35 (Rule 804(b)(6)).

[¶ 37.] For hearsay to be admissible under this rule, the proponent must establish: (1) the declarant is unavailable; (2) the statement must have circumstantial guarantees of trustworthiness equivalent to the first four exceptions in Rule 804(b); (3) the statement must be offered as evidence of a material fact; (4) the statement must be more probative on the point for which it is offered than any other evidence that the proponent reasonably can procure; (5) the statement must serve the interests of justice and the purposes of the rules of evidence; (6) the proponent of the evidence to be offered must have given advance notice to the other side. SDCL 19–16–35 (Rule 804(b)(6)). *See United States v. Love,* 592 F.2d 1022, 1026 (8th Cir.1979). Because our rule is identical to former FRE Rule 804(b)(5), now FRE 807, and many federal courts have examined this rule, it is helpful to use federal cases in our analysis. As the federal courts have recognized, this rule is to be used " 'rarely, and only in exceptional circumstances.' " United *States v. Woolbright,* 831 F.2d 1390, 1396 (8th Cir.1987) (quoting *Love,* 592 F.2d at 1026).

[¶ 38.] The test for admissibility of evidence in general should not be confused with the rules for admissibility under this hearsay exception. It is true, of course, that if Sean Boyle had been a live witness, his credibility would have been solely for the jury to determine. *See* 19–14–1 (Rule 601). But he was a hearsay declarant, not a trial witness. The preliminary question of trustworthiness, underlying the admissibility of "catchall" hearsay statements, is a question for the court, rather than a question of weight for the jury. SDCL 19–9–7 (Rule 104(a)). The trial judge has both the obligation and the " 'considerable discretion' " to determine whether " 'hearsay statements contain the necessary circumstantial guarantees of trustworthiness' " to be admissible under this rule. *See United States v. Guinan,*

836 F.2d 350, 354 (7th Cir.1988), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2871, 101 L.Ed.2d 907 (1988) (quoting United *States v. Vretta*, 790 F.2d 651, 659 (7th Cir.1986), *cert. denied*, 479 U.S. 851, 107 S.Ct. 179, 93 L.Ed.2d 115 (1986)).

[¶ 39.] Hearsay generally does not qualify as admissible evidence. SDCL 19–16–4 (Rule 802). Rule 804(b)(6) is one of the narrowly tailored exceptions to the general rule excluding hearsay evidence. The proponent offering hearsay evidence has the affirmative burden of establishing the trustworthiness requirement in Rule 804(b)(6). United *States v. Snyder*, 872 F.2d 1351, 1354–55 (7th Cir.1989). The rule requires that a hearsay statement not covered by some other exception be supported by "equivalent circumstantial guarantees of trustworthiness" before it can be admitted.[6]

[¶ 40.] The circumstances a trial court should consider in assessing the trustworthiness of hearsay testimony include: (1) the character of the witness for truthfulness and honesty and the availability of evidence on that question; (2) whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; (3) the relationship of the witness to the parties and any motivation the witness had for making the statement; (4) the extent to which the witness's statement reflects personal knowledge; (5) whether the witness ever recanted the statement; (6) the existence of corroborating evidence; and (7) the reasons for the unavailability of the witness. *Id.* at 1355. These considerations are neither exhaustive nor absolute, and each case must be analyzed on its own facts. *United States v. Doerr*, 886 F.2d 944, 956 (7th Cir.1989) (quoting *Snyder*, 872 F.2d at 1355–56.) The trial court did in fact consider most of these circumstances.

[¶ 41.] Under these criteria, we conclude that the circuit court did not abuse its discretion in refusing to admit the statement. The statement was given by a felony suspect, who was unavailable because he was in flight from the authorities. Nothing about this gives us any comfort that he has a character for truthfulness and honesty. His statement was not given under oath, not subject to cross-examination, and not subject to any penalty for perjury. The statement was not even given to Attorney Finch in person. It was given over the telephone. We have no way of knowing what Boyle's motivation was for giving the statement. There is no corroboration of his claimed observations. Lastly, the circumstances of his being unavailable strongly suggest that he would not be the type of person to garner credibility. The trial court properly considered all these facts in deciding that this hearsay was inadmissible.

[¶ 42.] In any event, Boyle's statement to Finch was only marginally relevant. As the trial court found, Boyle did not place a time frame on what he saw. The court regarded this as crucial. Indeed, Engesser himself indicated that he left the bar with the deceased around 5:30 to 6:00 p.m. That would have been the time Boyle would have seen them. The acci-

---

6. Recently, under Confrontation Clause analysis, not under Rule 804(b)(6) analysis, we concluded that the circuit court erred in admitting on behalf of the State, the hearsay statement of an unavailable witness. *State v. Frazier*, 2001 SD 19, 622 N.W.2d 246. However, it is important to emphasize that the test for admissibility under the Confrontation Clause is not the same as the test under Rule 804(b)(6). Considerations such as whether the hearsay can be corroborated and whether it is the only evidence available have no place in Confrontation Clause analysis.

dent, however, occurred two to two and half hours later. But the bar was only ten to fifteen minutes from the scene of the accident. Thus, who was driving the car so long before the accident had little relevance to the question of who was driving it at the time of the accident. Even Engesser admitted that he had been driving the car earlier in the day. Lastly, it must be understood, as South Dakota's Professor Larson explains, that even when a statement qualifies as a hearsay exception, it does not mean that the statement must be admitted: "The balancing test of SDCL 19–12–3 (Rule 403) applies regardless, and the statement is subject to the requirement of the other rules of evidence." John W. Larson, South Dakota Evidence § 804.6, p. 703 (1991). Thus, the trial court was well within its discretion in concluding that this statement was "unreliable," i.e., had little probative value. The "admissibility of evidence rests largely in the discretion and practical judgment of the trial court." *Table Steaks v. First Premier Bank*, 2002 SD 105, ¶ 38, 650 N.W.2d 829, 838. Here, the court carefully exercised its judgment in refusing admission of this statement, and it did not abuse its discretion in doing so.

### 4. Spoliation Instruction

■■■■ [¶ 43.] At trial, the defendant proposed two jury instructions rejected by the trial court.[7] To establish reversible error from a trial court's refusal to give a requested instruction, the party asserting error must show that (1) the tendered instruction was a correct statement of the law, (2) the instruction was warranted by the evidence, and (3) the error in not giving the instruction was prejudicial. *State v. Webster*, 2001 SD 141, ¶ 7, 637 N.W.2d 392, 394. Prejudice is shown by establishing that the jury would have returned a different verdict if the proposed instruction had been given. *State v. Knoche*, 515 N.W.2d 834, 838 (S.D.1994). Because Engesser's proposed instructions on spoliation were inaccurate under the law and unwarranted under the facts, the trial court properly exercised its discretion in refusing to give them.

■■■■ [¶ 44.] Intentional destruction of evidence, a form of obstruction of justice, is called "spoliation." McCormick on Evidence § 273 at 660–61 (2d ed. 1972); Black's Law Dictionary 1401 (6th ed. 1990). When it is established, a fact finder may infer that the evidence destroyed was unfavorable to the party responsible for its destruction.[8] *Id.;* 22A CJS Criminal Law § 596 at 377 (1961). *See United States v. Remington*, 191 F.2d 246, 251 (2dCir.1951) (suppression of evidence). Spoliation is more than simply the loss of evidence. Our prior cases have never analyzed when precisely an instruction on spoliation is warranted. In *State v. Kietzke*, the Court simply recited the rule and found no prejudice in the trial court's refusal to give the instruction. 85 S.D. 502, 515, 186 N.W.2d 551, 558 (1971). However, it is vital to understand that an adverse inference drawn from the destruction of evidence is predicated only on bad conduct. *United*

---

**7.** Those proposed instructions were:

1) "The State of South Dakota, and its duly authorized agents, including the Meade County State's Attorney's office, the Meade County Sheriff's office, and the South Dakota Highway Patrol, have a duty to preserve evidence gathered and taken into possession in this criminal investigation and prosecution."

2) "Spoliation of evidence creates an inference or presumption that it would not have supported the charges against the defendant."

**8.** The spoliation inference is a product of the legal maxim "omnia praesumuntur contra spoliatorem"—all things are presumed against the destroyer.

*States v. Wise,* 221 F.3d 140, 156 (5th Cir.2000), *cert. denied,* 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). The defendant's argument seems to presuppose that any evidence destroyed at the hands of the police, whether by mistake, inadvertence, oversight, misjudgment, negligence, or ignorance, warrants an adverse inference instruction. That is incorrect. A proper application of the rule requires a showing of an intentional act of destruction. Only intentional destruction will sustain the rule's rationale that the destruction amounts to an admission by conduct of the weakness of one's case. McCormick at 660–61; 31A CJS Evidence § 293 at 750–51 (1964).[9]

■■■ [¶ 45.] A substantial number of courts have held that a spoliation instruction is not appropriate when the destruction is not intentional. *See, e.g., Randolph v. State,* 117 Nev. 970, 36 P.3d 424 (2001); *Jackson v. State,* 791 So.2d 830 (Miss. 2001); *Patterson v. State,* 356 Md. 677, 741 A.2d 1119 (1999); *State v. Vanover,* 721 A.2d 430 (R.I.1998); *State v. Steffes,* 500 N.W.2d 608 (N.D.1993); *People v. Cooper,* 53 Cal.3d 771, 809 P.2d 865, 281 Cal.Rptr. 90 (1991) (in banc); *State v. Langlet,* 283 N.W.2d 330 (Iowa 1979); *Torres v. State,* 962 P.2d 3 (Okla.Crim.App.1998). The same rule applies in criminal and civil cases. *See, e.g., Spesco v. General Elec. Co.,* 719 F.2d 233 (7th Cir.1983). *But see,* e.g., *State v. Fulminante,* 193 Ariz. 485, 975 P.2d 75 (1999); *Lolly v. State,* 611 A.2d 956 (Del.1992).

It is a general rule that the intentional spoliation or destruction of evidence relevant to a case raises a presumption, or, more properly, an inference, that this evidence would have been unfavorable to the case of the spoliator. *Such a presumption or inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.*

*Jackson,* 791 So.2d at 838 (quoting *Tolbert v. State,* 511 So.2d 1368 (Miss.1987)) (emphasis in original). A few courts hold the view that spoliation of evidence need not be intentional to warrant sanctions. *See, e.g., Wajda v. Kingsbury,* 652 N.W.2d 856 (Minn.Ct.App.2002).

■■■ [¶ 46.] As the Nebraska Supreme Court recognized, even when it is not proper for the trial court to give an adverse inference instruction, a defendant can still, when relevant evidence was destroyed or not presented, use the absence of that evidence in argument against the prosecution. *State v. Davlin,* 263 Neb. 283, 639 N.W.2d 631, 648 (2002). In this case, Engesser had the opportunity to use the failure to preserve any blood spatter evidence in argument to the jury and as a basis for cross-examining the State's witnesses. As the *Davlin* Court explained,

[m]any inferences may be drawn from a missing piece of evidence; however, emphasis on one possible inference, com-

9. Wigmore explains the rationale as follows: It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or un-

founded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.

2 John H. Wigmore, Evidence in Trials at Common Law § 278(2) (Chadbourn Rev 1979).

municated to the jury as part of the court's binding jury instructions, creates the danger that the jury may give that inference undue weight. At the very least, a trial judge's jury instruction may have the effect of overemphasizing just one of the many proper inferences that a jury may draw. Absent a showing of bad faith on the part of the State, such emphasis is unwarranted.

*Id.* at 649 (internal citation omitted). An instruction on the inference that may be drawn from the spoliation of evidence is proper only when substantial evidence exists to support a conclusion that the evidence was in existence, that it was in the possession or under the control of the party against whom the inference may be drawn, that the evidence would have been admissible at trial, and that the party responsible for destroying the evidence did so intentionally and in bad faith. *See Langlet,* 283 N.W.2d 330.

[¶ 47.] Here, the record does not show that the destruction of the missing evidence was intentional or made in bad faith. On the contrary, before Trooper Fox left the auto in the impound yard on the night of the accident, he recognized the possible value of any such evidence and looked for indications of bodily fluids in the car. He saw none. Nevertheless, he notified his superiors of the possibility that there may be evidence in the vehicle and asked them to send someone to examine it. When the State's forensic expert, Rex Riis, looked at the car, he found only a trace amount of blood on the roof. He concluded that because the car had rolled, the significance of any bodily fluids in the vehicle was greatly diminished. He also concluded that no evidentiary value existed in the form of biological evidence. Even if one could deduce that Trooper Fox should have taken steps to make sure the vehicle was not exposed to the elements, nothing in the record suggests that he intentionally

sought to destroy evidence. In fact, it is apparent from the record that he looked for any evidence that would demonstrate who the driver of the vehicle was. If he erred in not preserving the car from the elements, such an act can only be deemed negligent. Consequently, the evidence simply does not support an inference that any State agent intentionally destroyed evidence thought to be unfavorable to the State, and the circuit court did not err in refusing Engesser's requested instructions. As the Wisconsin Court wrote in *Jagmin v. Simonds Abrasive Co.,* 61 Wis.2d 60, 81, 211 N.W.2d 810, 821 (1973), the spoliation doctrine is "reserved for deliberate, intentional actions and not mere negligence even though the result may be the same as regards the person who desires the evidence." Other authorities agree. *See* 1 Jones on Evidence §§ 3.90, 3.93, at 321, 329 (6th ed. 1972); 1 Wharton's Criminal Evidence § 117 at 197 (13th ed. 1972). The inference and the scope of its application are discussed at 31A CJS Evidence § 152 at 388 (1964). "Such a presumption or inference arises, however, only where the act was intentional, and indicates fraud and a desire to suppress the truth." Am.Jur.2d *Evidence* § 244 DESTRUCTION OR SPOLIATION OF EVIDENCE (2002 supp.).

[¶ 48.] Even assuming that some form of a spoliation instruction should have been given, an unwarranted assumption here, Engesser has shown no prejudice in the court's failure to give one. No forensic expert testified that if the blood spatter evidence had been preserved, it would have shown who was in the driver's seat. In examining this concept, the Iowa Supreme Court warned that the spoliation rule should be "applied with caution[.]" *Langlet,* 283 N.W.2d at 335. A "mere possibility" that the destroyed evidence would be helpful is not enough. *Id.*

[¶ 49.] Lastly, there was no due process violation in denying these proposed instructions. In accord with *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), to establish a due process violation, there must be some showing of bad faith on the part of law enforcement, such as the destruction of evidence not as the result of some routine practice or plain negligence but with the aim of directly denying Engesser the right to present favorable evidence. *Id.* at 57, 109 S.Ct. 333.

[¶ 50.] Affirmed.

[¶ 51.] GILBERTSON, Chief Justice, and ZINTER, Justice, concur.

[¶ 52.] SABERS, Justice, and AMUNDSON, Retired Justice, concur in part and dissent in part.

[¶ 53.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 54.] I concur on Issue 1 but dissent on Issues 2, 3 and 4 because the cumulative error created by the trial court's rulings on those issues warrants remand to provide Engesser with a fair trial.

### *ISSUE 2*

[¶ 55.] **THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING THE STATE TO ELICIT STATEMENTS FROM TROOPER FOX THAT THE DEFENDANT WAS LYING.**

[¶ 56.] I agree with the majority opinion that Engesser failed to raise his character and reputation objections at trial and therefore waived them on appeal. However, the majority errs in ending the analysis with this conclusion because Engesser also raised and properly preserved his objections as to relevance, prejudice, and ultimate issue. Because it was highly prejudicial to allow the State to elicit the Trooper's opinion that Engesser was lying, the trial court should have excluded the testimony.

[¶ 57.] SDCL 19–12–1, and its counterpart, Rule 401 of the Federal Rules of Evidence (FRE 401), provide that relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Among the Defendant's statements referred to by Fox was Engesser's assertion that he was not driving the car. This statement summed up a primary argument by the Defendant at trial. Thus, evidence that the statement was untrue is arguably probative of the issue of guilt and we will assume it was relevant for the purpose of argument. However, even assuming the testimony was relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" SDCL 19–12–3; *See also* FRE 403.

[¶ 58.] Under SDCL 19–12–3, the trial court may exclude evidence if that evidence, "would provide the jury with an undue tendency to decide the case on an improper basis." *Shamburger v. Behrens,* 380 N.W.2d 659, 661 (S.D.1986) (citing *State v. Dunton,* 396 A.2d 1001 (Me.1979)). The term "prejudice" in this statute "does not mean damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Holland,* 346 N.W.2d 302, 309 (S.D.1984) (citations omitted). Therefore, the simple fact that the

statements were harmful to the Defendant does not necessarily mean they are unfairly prejudicial. *State v. Brings Plenty*, 459 N.W.2d 390, 399 (S.D.1990). The language of the rule itself must be kept firmly in mind, the prejudice must *substantially* outweigh the probative value of the evidence, and the burden is on the opponent to make this showing.

[¶ 59.] We have consistently held that, "it is the function of the jury to resolve evidentiary conflicts, determine the credibility of witnesses, and weigh the evidence." *State v. Raymond*, 540 N.W.2d 407, 409–10 (S.D.1995) (quoting *State v. Svihl*, 490 N.W.2d 269, 274 (S.D.1992) (additional citation omitted)). Generally, "one witness may not testify as to another witness' credibility or truth telling capacity because such testimony would invade the exclusive province of the jury to determine the credibility of a witness." *McCafferty v. Solem*, 449 N.W.2d 590, 592 (S.D.1989).

[¶ 60.] The trial court abused its discretion in allowing this testimony over the objection of prejudice. It is the province of the jury, not the trooper, to ascertain the truth and credibility of Defendant's statements in the interview. Fox's testimony took the ultimate question of who was driving at the time of the accident out of the jury's hands. Further, the tenor of Fox's testimony indicated that he had specialized knowledge that would give him a greater ability to judge truthfulness than an ordinary person. Specifically, he based his opinions as to the Defendant's veracity upon his "experience interviewing people." His statements and the manner in which they were presented gave him "an aura of expertise" that improperly implied to the jury that he spoke the truth of the matter. *Raymond*, 540 N.W.2d at 410 (stating, "expert testimony particularly courts the [danger of undue prejudice or of confusing the issues or misleading the jury] because of its aura of special reliability and trust-

worthiness") (citations omitted). *See also, Bowles v. Florida*, 381 So.2d 326, 328 (1980) (noting, "[p]olice officers, by virtue of their positions, rightfully bring with their testimony an air of authority and legitimacy. A jury is inclined to give great weight to their opinions as officers of the law").

[¶ 61.] South Dakota has abolished the ultimate issue rule and instead has adopted SDCL 19–15–4, which coincides with FRE 704. The statute provides, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." SDCL 19–15–4. However, in order for such testimony to be admissible it must be relevant and it must help the trier of fact understand the evidence or decide the issues. *State v. Guthrie*, 2001 SD 61, ¶ 32, 627 N.W.2d 401, 415. Further, "[o]pinions merely telling a jury what result to reach are impermissible as intrusive, notwithstanding the repeal of the ultimate issue rule." *Guthrie*, 2001 SD 61, ¶ 33, 627 N.W.2d at 416 (citation omitted). Although the State did not ask Fox to testify directly as to Engesser's guilt or innocence, the State did ask whether Engesser was lying. Given that the primary issue in this case was Engesser's truthfulness regarding the identity of the driver that night, the testimony wrongfully invaded the duty and the province of the jury to determine Engesser's guilt or innocence. These things taken together prejudiced the Defendant's right to a fair trial.

### ISSUE 3

[¶ 62.] **THE TRIAL COURT ABUSED ITS DISCRETION BY HOLDING THE EXCULPATORY HEARSAY INADMISSIBLE.**

[¶ 63.] The trial court found the hearsay testimony inadmissible based on the following factors:

1) the affidavit submitted by the civil attorney did not state the time at which the declarant claimed to have seen Finley drive away from the saloon;

2) the proponent was offering the testimony through an attorney for the Defendant;

3) the statement was made by a felon in flight;

4) the statement was unreliable in that it stated that Finley seldom let others drive her car but the Defendant had already admitted he had driven the car earlier on the day of the accident;

5) the statement would come in without the opportunity for the State to cross-examine it;

6) the statement came through a phone call between declarant and witness rather than a face-to-face meeting.

[¶ 64.] The factors that the trial court relied on to exclude this testimony went to the weight of the evidence rather than to its admissibility. First, the fact that there was no indication in the statement as to the time the declarant saw the Defendant and Finley leave the bar simply put the matter of timing to the jury as a question of fact. The determination of time was solely for the jury and a necessary factor for the jury to consider in deciding the value or weight of the testimony. Second, the attorney is an officer of the court who is oath-bound not to commit perjury. There is no indication in the record that he lacked either the ability or the willingness to tell the truth.

[¶ 65.] The third factor the court relied upon, that the statement was made by a felon in flight, was also an issue of weight rather than admissibility. The State would have had ample opportunity to present evidence that the declarant was a felon in flight and the information would have allowed the jury to weigh the credibility of his statement. The fourth factor, that the State would have no opportunity to cross-examine the statement, is equally a question of weight. The State could have brought in witnesses to testify regarding the declarant's credibility, could have presented evidence that the witness was an attorney for the Defendant and it did introduce Engesser's statements as to the time he and Finley left the bar and his admission that he had previously driven the car.

[¶ 66.] There were certain "circumstantial guarantees of trustworthiness." First, the testimony was based on the attorney's notes taken contemporaneously with the conversation. This information was delivered to the State's Attorney's office immediately with a request to investigate the statement. The information was forwarded to the State's Attorney's office before criminal charges were even filed. The fact that the State did not follow up with an interview of the declarant does not make the statement less trustworthy. The fact that the attorney forwarded it to the State is an indication of his good faith in coming forward with the evidence at trial.

[¶ 67.] Second, the statement was offered as evidence of two material facts: 1) who was driving that evening, and 2) the habit of Finley to rarely let others drive her car. SDCL 19–16–35(1).

[¶ 68.] Third, Engesser argues, and the record supports that he was unable to secure other, more probative evidence of who was driving that evening, satisfying SDCL 19–16–35(2).

[¶ 69.] Fourth, the general purpose of the rules of evidence is to allow the jury to hear all relevant evidence and to fully inform the jury as to the material issues presented for trial. The jury was perfectly capable of taking into account all of the arguments expressed by the trial court

and the State was free to assert those arguments.

[¶ 70.] Fifth, notice of intent to offer the evidence was given.

[¶ 71.] Sixth, the character of the statement is extremely important. Quite clearly, this was potentially exculpatory evidence which the jury should have had the opportunity to weigh against the case presented by the State. There is no indication in the record of an illegitimate motive of the declarant, nor is there an indication of any prior relationship between declarant and witness to color the testimony in any prejudicial manner. This testimony should have been admitted. The court abused its discretion in denying admission of the testimony. This denial also prejudiced the Defendant's right to a fair trial.

### ISSUE 4

[¶ 72.] **THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO GIVE INSTRUCTIONS ON DUTY TO PRESERVE AND SPOLIATION OF EVIDENCE.**

[¶ 73.] It is well established that "[a] criminal defendant is entitled to an instruction on his theory of the case when evidence exists to support his theory." *State v. Charles*, 2001 SD 67, ¶ 19, 628 N.W.2d 734, 738 (citing *State v. Charger*, 2000 SD 70, ¶ 40, 611 N.W.2d 221, 229). Jury instructions are adequate when "they give the full and correct statement of the law applicable to the case." *State v. McVay*, 2000 SD 72, ¶ 18, 612 N.W.2d 572, 576 (citation omitted). Although errors in instructing the jury do not invariably rise to a constitutional level, "if the error goes to the heart of a defendant's theory of defense it can infringe upon defendant's rights to due process and jury trial." *Miller v. State*, 338 N.W.2d 673, 676 (S.D. 1983) (citing *Zemina v. Solem*, 438 F.Supp.

455 (D.S.D.1977) aff'd, 573 F.2d 1027 (8th Cir.1978)). When there is evidence to support a criminal defendant's theory of the case, he or she is entitled to an instruction on the theory. *Charger*, 2000 SD 70, ¶ 40, 611 N.W.2d at 229. Applying this analysis, we should hold that it was abuse of discretion to refuse to give the proposed instructions.

[¶ 74.] We have held that spoliation of evidence creates an inference or presumption that the evidence would not have supported the charges against the defendant. *State v. Kietzke*, 85 S.D. 502, 515, 186 N.W.2d 551, 558 (1971) (citing 22A CJS Criminal Law § 596, at page 377; *State v. Oster*, 232 Or. 396, 376 P.2d 87; *People v. Foreman*, 112 Cal.App.2d 616, 246 P.2d 979; *Bruck v. State*, 244 Ind. 466, 193 N.E.2d 491; *United States v. Remington*, 191 F.2d 246 (2nd Cir.1951), cert. denied, 343 U.S. 907, 72 S.Ct. 580, 96 L.Ed. 1325; Wigmore on Evidence, 3rd Edition, § 291). See also *State v. Johnson*, 509 N.W.2d 681, 687 (S.D.1993) (quoting *Kietzke* and stating, "[e]vidence which is destroyed before it is inventoried or chemically analyzed (spoilation [sic] of the evidence) 'creates an inference or presumption that it would not have supported the charges against the defendant.' ")

[¶ 75.] The theory of the defense was that Engesser was not driving the car at the time of the accident. Because both occupants of the car had injuries resulting in bleeding, there may have been blood or other trace evidence in the car that could have supported this theory. Any such evidence may have been destroyed by the State's failure to protect it from degradation. The State's expert testified,

> its my understanding that the initial impact in an automobile is where trace evidence of significance can be interpreted, that is the deposition of that trace

evidence, it can be correlated back to where the occupants were.

Three weeks had elapsed since the accident by the time the State's expert arrived to look at the vehicle. Throughout that time, the car was exposed to the elements which may have destroyed the viability of any blood or trace evidence within the car. The expert testified that proper preservation of the evidence would have been to store it in a place protected from the elements. He further testified that his decision not to test the blood evidence was based at least in part upon the failure to preserve the evidence.

[¶ 76.] The State's primary objection to these jury instructions was that they would be tantamount to directing a verdict for the Defendant. By its own words, the State acknowledges that failure to give the instructions probably would have led the jury to a different verdict. Under these circumstances, denial of the instructions substantially prejudiced the Defendant's right to a fair trial.

[¶ 77.] Here, there was degradation of potentially exculpatory evidence because the State failed to take the smallest steps to preserve that evidence. Despite the fact that Defendant was prejudiced by the State's inaction, the majority not only affirms the trial court's decision to deny the spoliation instruction, but would make it nearly impossible for a criminal defendant to ever be entitled to an instruction regarding adverse inferences. The majority relies on *Arizona v. Youngblood* and several state court decisions stemming from *Youngblood* to hold that absent intentional and bad faith destruction of evidence by the State, a defendant is not entitled to an

instruction for spoliation. That simply ignores the State's affirmative duty to preserve evidence. Such a bright line rule essentially prohibiting an instruction on spoliation goes beyond even what the United States Supreme Court held in *Youngblood*.[10]

[¶ 78.] As a threshold matter, the majority's determination that the failure to preserve the evidence was unintentional is not supported by the record. Trooper Fox indicated that he was well aware of the potential evidentiary value of blood splatter in the vehicle. Despite this awareness, Trooper Fox made the conscious decision to leave the vehicle out of doors and exposed to the elements. Moreover, the fact that Trooper Fox was not motivated by a desire to destroy evidence should not be the only determinative factor. Rather, the Court should at least consider the trooper's knowledge that exposure to the elements would destroy evidence and the minimal amount of effort it would have taken for the State to preserve the evidence. Furthermore, the State forensic expert's testimony that "no evidentiary value existed in the form of biological evidence" is based on his evaluation which occurred after the car had been exposed to the elements for three weeks and thus does not support the majority's position that the Defendant has shown no prejudice.

[¶ 79.] The majority's determination that a criminal defendant must prove bad faith destruction of evidence to be entitled to an instruction on spoliation is not in accord with due process. This Court has consistently held that the State has a duty to preserve and hand over to the defen-

---

**10.** In *Youngblood,* the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."

488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289. The Court did not address whether the defendant was entitled to an instruction on spoliation or any other redress.

dant evidence gathered in the course of an investigation when that evidence is material either to guilt or punishment. See e.g. *State v. Lyerla*, 424 N.W.2d 908, 910 (S.D. 1988) (citations omitted). The prosecution's good or bad faith is irrelevant to that duty. *Id.* It violates principles of fundamental fairness to impose upon the defendant this added burden of proving bad faith when the State fails to preserve potentially exculpatory evidence. This is particularly true in a case such as this where the State's burden to preserve the evidence is so slight. Simply throwing a tarp over the top of the vehicle or parking it in an enclosed area could have preserved some or all of the evidence. The State failed to do even this, and that failure removed a possible defense. When the State's negligence directly affects such a crucial piece of evidence, the defendant should be entitled to some remedial sanction by the trial court.

[¶ 80.] Other state courts have declined to adopt the bad faith standard of *Youngblood* and this Court should follow suit. For example, the Supreme Court of Alaska pointed out "The *Youngblood* decision could have the unfortunate effect of encouraging the destruction of evidence to the extent that evidence destroyed becomes merely 'potentially useful' since its contents would be unprovable." *Thorne v. Dept. of Public Safety*, 774 P.2d 1326, 1331 (1989). *See also, Torres v. State*, 962 P.2d 3 (1998); *Lolly v. State*, 611 A.2d 956, 960 (Del.1992); *Commonwealth v. Henderson*, 411 Mass. 309, 582 N.E.2d 496, 497 (1991). Furthermore, as Justice Stevens pointed out in his concurring opinion in *Youngblood*, there may be cases "in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." 488 U.S. at 61, 109 S.Ct. at 339, 102 L.Ed.2d at 291.

[¶ 81.] This bright line test is inconsistent with due process. Requiring a showing of bad faith in order to be permitted an adverse inference instruction precludes the instruction in nearly every case unless State actually admits to bad faith destruction. *See e.g. Lolly*, 611 A.2d at 960 (rejecting the bright line bad faith test and noting that "short of an admission by the police, it is unlikely that a defendant would ever be able to make the necessary showing to establish the required elements for proving bad faith"). Furthermore, requiring a showing of bad faith in order to receive the instruction is not entirely consistent with *Youngblood*. There the Supreme Court held that there was no violation of due process when the state failed to preserve evidence. However, in that case, the trial court had instructed the jury that if it found that the state lost or destroyed evidence, it could infer that the true facts were against the state's interest. *Youngblood*, 488 U.S. at 60–61, 109 S.Ct. at 338, 102 L.Ed.2d at 291. In other words, the trial court in *Youngblood* allowed redress for the defendant where the state had failed in its duty to preserve material evidence. The Supreme Court did not hold that a defendant was not entitled to a jury instruction on spoliation absent a showing of bad faith. Rather than adopting this bright line rule for every case, this Court should allow redress for the defendant who is denied the opportunity to examine and present potentially exculpatory evidence.

[¶ 82.] The majority is imposing a *specific intent* requirement of bad faith. This is totally unwarranted. Spoliation of food occurs if one fails to refrigerate it. Spoliation of evidence occurs if one fails to protect it from the elements. That is exactly what happened here. There should be no requirement that a defendant prove the State spoiled evidence with *specific intent* to deny the defense the use of it. The defense was entitled to the instruction.

[¶ 83.] Due process requires that the defendant be accorded "a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413, 419 (1984). The Defendant in this case was not afforded that opportunity, nor was he allowed the jury instruction which would have corrected the State's error in failing to preserve potentially exculpatory evidence.

[¶ 84.] We have held that cumulative errors on the part of a trial court may support a holding by the reviewing court that a defendant did not receive his or her constitutionally guaranteed right to a fair trial. *McDowell v. Solem,* 447 N.W.2d 646 (S.D.1989). *See also State v. Bennis,* 457 N.W.2d 843 (S.D.1990); *State v. Dokken,* 385 N.W.2d 493 (S.D.1986). The question is whether, on a review of the entire record, Engesser had a fair trial. The trial court's rulings on Issues 2, 3 and 4 constitute cumulative error in this case and this Court should remand for a fair trial.

[¶ 85.] AMUNDSON, Retired Justice, joins this dissent on Issues 2 and 4.